IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
                                :
THE HELLENIC MINISTRY OF NATIONAL
   DEFENSE, et al.              :

   v.                          :   Civil Action No. DKC 13-0828

                                :

EAGLE VAN LINES, INC.          :

                                :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this contract case are cross motions for partial summary judgment filed by Plaintiffs and/or Counterdefendants the Hellenic Ministry of National Defense, the Hellenic Armed Forces, and the Hellenic Air Force Procurement Service (collectively, "HAF" or "Plaintiffs") (ECF No. 30) and Defendant and/or Counterplaintiff Eagle Van Lines, Inc. ("EVL" or "Defendant") (ECF Nos. 35 & 36). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion will be granted in part. Defendant's motion will be denied.

I. **Background**

   A. **Factual Background**

Unless otherwise noted, the following facts are undisputed. Plaintiffs are units of the Greek government. The Hellenic Ministry of National Defense is a government cabinet department responsible for managing the armed forces for the Hellenic

Republic.   The Hellenic Armed Forces are the combined military forces of Greece.   Hellenic Air Force Procurement Service is a government agency that engages vendors to transport and store military goods for the Hellenic Ministry of National Defense. (ECF No. 3 ¶¶ 1-3).   EVL is a freight forwarding company based in Maryland.   (ECF No. 3 ¶ 4).[1]   Beginning in 2005, Plaintiffs entered into a series of contracts with EVL to transport military goods and equipment from Greece to the United States, within the United States, and from the United States to Greece. (ECF No. 30-4 ¶ 4).   Regardless of the channels used by the Hellenic Armed Forces to purchase particular goods, the goods were shipped to EVL, which would receive them on Plaintiffs' behalf and ship them to the appropriate branch of the Armed Forces in Greece.   (*Id.*).   The military goods included items acquired from the United States via foreign military sales ("FMS") or items purchased from vendors in the United States through direct commercial sales ("DCS").   (ECF No. 35-2 ¶ 5).

George Georgakopoulos is the President of EVL.   He explained:

> It was Eagle Van Lines' responsibility, at
> times, to receive goods shipped from
> overseas and transport them to its

---

[1] EVL's President, George Georgakopoulos states that EVL is a moving and storage company.   "Among other services[,] it is in the business of transporting and storing commercial and military goods for domestic and international, including foreign countries."   (ECF No. 35-2 ¶ 4).

> warehouses, receive goods shipped by vendors
> and store the goods in its warehouses,
> receive goods from the United States under
> the foreign sales and receive the items in
> its warehouses.  Eagle Van Lines would pay
> for the delivery if a third party shipped
> the items to the warehouse or provide the
> transportation[,] incurring the costs if it
> picked up the goods from an international
> shipment or from a vendor.

(*Id.* ¶ 7).  "Throughout the time that EVL acted as freight forwarder for the Armed Forces, EVL would be paid for its services with respect to a given item only after that item had been received by the contractually determined Unit of each Armed Forces' Branch in Greece, in accordance with the payment terms of the contracts and Hellenic Legislation."  (ECF No. 30-4 ¶ 5).

In early 2009, Plaintiffs and EVL entered into Contract No. 100/09, which covered EVL's provision of freight-forwarding services from March 1, 2009 through November 30, 2009.[2]  (*Id.* ¶ 6; ECF No. 30-6, at 36).  Article 3.1 of Contract 100/09 states:

> The subject of this Contract is the transfer
> – forwarding (FREIGHT FORWARDER) of air
> transported materials of the HAF from Greece
> to the U.S.A. overseas (OVERSEAS), within
> the U.S.A. (DOMESTIC) and vice versa by the
> CONTRACTOR.

(ECF No. 30-6, at 6).  Under Article 4.5.1.4 of Contract 100/09, Defendant's obligations included forwarding the materials within

---

[2] Plaintiffs provide as exhibits to their motion the Greek original and English translation of the applicable documents, including Contract No. 100/09 and draft Contract No. 47/10 discussed below.

three (3) days from their arrival to their final recipient within the U.S. (*Id.* at 9). Article 8.3. of Contract No. 100/09 states:

> The Military Attaches will repay the CONTRACTOR in U.S. dollars for the services rendered by the contractor, *within two (2) months at the latest* from the date they received the required supporting documents, as the case may be, which the competent Services will receive in Greece, provided that a relevant inspection determines that they are appropriate.

(*Id.* at 19) (emphasis added). Contract No. 100/09 was set to expire on September 30, 2009, "but the contract provided that EVL was obligated to continue to receive and forward materials for *two months after that expiration date*, under the same terms and conditions." (*Id.*) (emphasis added). Thus, Contract No. 100/09 was in effect until November 30, 2009.

On August 18, 2009, EVL lost the procurement for freight-forwarding services for the period after November 30, 2009. (ECF No. 30-4 ¶ 8). The new contract was awarded to EVL's competitor, Imperio-Argo Group. (*Id.*). George Georgakopoulos testified during his deposition that "in 2009[,] there was a procurement for freight forwarding services [] that permitted a number of freight forwarding companies to make a bid on [] Contract 05/09." (ECF No. 30-26, at 5). EVL submitted a bid, but the Greek government awarded the contract to Imperio-Argo. (*Id.*). EVL objected to the procurement award by filing an

4

appeal to the State Legal Council of the Hellenic Republic, which suspended the commencement of the new contract with Imperio Argo until the appeal could be resolved. (ECF No. 3 ¶ 13).

In order to service Plaintiffs' transport requirements after November 30, 2009 and during the pendency of the procurement appeal, Plaintiffs engaged in negotiations with EVL regarding the terms of a contract that would govern from December 1, 2009 until the activation of a new contact with Imperio-Argo. (ECF No. 30-4 ¶ 10). The parties continued to negotiate a draft contract – Contract No. 47/10. Mr. Georgakopoulos stated that "[a] draft *for negotiations only* of a working document referred to as 47/10 had been initialed by representatives of the parties in January 2010. There were additional issues and discussions *that remained unresolved which discussions never resumed*." (ECF No. 35-2, at 6) (emphases added). The parties disagree whether they were governed by the terms of Contract No. 47/10 after Contract No. 100/09 terminated on November 30, 2009. George Georgakopoulos gave the following testimony during his deposition:

> Q: When did [] any contract between Eagle
> Van Lines and any branch of the Hellenic
> government end? Was it November 30, 2009?
>
> A: The last one, yes.

> Q:  And  there  has  been  since  then  no
> contract?
>
> A:  Absolutely no contract.

(ECF No. 30-26, at 7).  Mr. Georgakopoulos also testified:

> Q: Now looking at 47/10, at any point in
> January of 2010[,] did Eagle Van Lines agree
> to the terms of this contract?
>
> A: Agreed?  It was negotiated.  It was never
> agreed.

(ECF No. 30-26, at 5).[3]  Konstantinos Katirtzidis, Captain in the

Hellenic Air Force General Staff, declared that "[a]lthough the

draft contract [Contract No. 47/10] that had been signed by EVL

[] was still subject to final approval by the Minister of

National Defense, both [Hellenic Air Force] (on behalf of the

Armed Forces) and EVL proceeded on [the] basis that it was in

effect.  EVL continued to provide freight-forwarding services,

and [Hellenic Air Force] continued to accept the benefit of

those services, with the knowledge that EVL expected to be

compensated for them."  (ECF No. 30-4 ¶ 13).

---

[3]  In his declaration, Mr. Georgakopoulos stated: "[n]o one
on behalf of Eagle Van Lines ever signed or executed a final
document purporting to be Contract 47/10 and for the first time
during the course of discovery in this case did Eagle Van Lines
ever see a document titled as 47/10 which purports to [bear] the
signature of an individual whose stamp indicates is a[n] officer
in the Financial Control – Audit Division, Symeon
Grammatopoulos.  It b[ears] the signature date of May 4, 2010.
It is unilaterally signed with no other signatures appearing
anything for 'The Director' or for 'The Contractor.'"  (ECF No.
35-2 ¶ 16).

Plaintiffs assert that on January 25, 2010, they learned that "EVL had included a counterfeit document (a 'Letter of Guarantee' that had supposedly been issued by Eagle Bank) in its unsuccessful application during the procurement for the contract that had been awarded to [Imperio Argo]." (*Id.* ¶ 14). Plaintiffs maintain that as a result of that discovery, they terminated EVL's services as freight forwarder. (*Id.* ¶ 15). Specifically, Plaintiffs provide as an exhibit to their motion a decision from Evangelos Venizelos, the Minister of National Defense, dated February 12, 2010, which states:

> *We approve the discontinuation, effective upon receipt of the present resolution*, of the air transportation of materials of the Armed Forces (A.F.) from Greece to the U.S.A., within the U.S.A. and vice-versa by the company "EAGLE VAN LINES" due to their attempt to defraud the public sector, according to the rationale of the present resolution.

(ECF No. 30-11, at 4) (emphasis added). EVL contends that it received Plaintiffs' February 12, 2010 letter terminating its services on February 24, 2010. (ECF No. 35-2, ¶ 13, declaration of George Georgakopoulos) ("On February 24, 2010, I received by hand delivery and by email the letter from the Minister of National Defense from Mr. Nikolasos Klothakis who was the liaison officer placed in the offices of Eagle Van Lines by the Hellenic Air Force as a direct attache authorized to approve transportation and resolve issues that might arise under the

7

freight forwarding contracts.")).   EVL also denies submitting a
fraudulent letter of guarantee.  (*See* ECF No. 35-2 ¶ 10 ("Eagle
Van Lines did not author nor submit an alleged letter of credit
purporting to be from Eagle Bank bearing a date of April 11,
2009.")).[4]

There is some disagreement between the parties about the
chain of events following the termination of EVL's services.
Plaintiffs contend that they "instructed EVL that all
unclassified goods in its possession belonging to the Hellenic
Armed Forces were to be forwarded to another contractual freight
forwarder of the Ministry of Defense, Stellar Maritime."  (ECF
No. 30-4 ¶ 17).  According to Plaintiffs, "EVL refused to comply
with that instruction unless the Armed Forces first paid on all
EVL invoices that EVL claimed it was owed and storage fees
charged by EVL since February 12, 2010."  (*Id.*).  On February
24, 2010, George Georgakopoulos wrote the following letter to
Nikolaos Klothakis, Wing Commander for the Hellenic Air Force:

---

[4] Mr. Georgakopoulos declared:

> I have no personal knowledge of who prepared
> such a document, however, I can state
> affirmatively that at the same period of
> time as said document is claimed to have
> been submitted by Eagle Van Lines, we
> already had a valid and existing letter of
> credit on file with [the] Greek government
> from M&T Bank.

(ECF No. 35-2 ¶ 10).

In response to the subject matter of your
letter, we hereby inform you that we accept
the decision of your Service, that is, for
our company to deliver all materials that
are in our warehouses to the transportation
company you referenced in your letter
[Stellar Maritime], *but only under the
following conditions*:

a) Until the day of the scheduled
delivery of the materials, every amount due
by the Greek Government must have been
repaid to our company, which to date amounts
to USD 2,746,000.36

b) A complete inventory of all
materials of the Armed Forces, in our
warehouses must be conducted immediately and
prior to every delivery of any material

c) Official notification to our
company, by the competent DSS service, for
the suitability and approval of the
warehouse space of the company STELLAR
MARITIME LTD C/O V. ALEXANDER AND CO INC.

(ECF No. 30-31, at 2) (emphasis added). According to Defendant,

"Eagle Van Lines began to receive solicitations from several

individuals claiming to have the ability to affect Eagle's

receipt of its outstanding invoices demanding money for the

invoices to be paid." (ECF No. 35-2 ¶ 11). In other words, EVL

contends that certain Greek officials attempted to solicit

bribes as a condition to paying the outstanding invoices owed to

EVL.[5]

---

[5] Mr. Georgakopoulos declares that "[t]he solicitations for
money came from Asterios Koulouktsis, commander of the supply
depot (Kefa) of Hellinic Air Force, Mr. Paliagas, commander of
the procurement agency of the Hellenic Air Force, Mr.

According to Plaintiffs, "[a]fter terminating EVL's services as freight forwarder, [they] took steps to ensure that goods would no longer be shipped to EVL.  Those steps included notifying the U.S. agency that oversees the [Foreign Military Sales] program and various commercial vendors." (ECF No. 30-4 ¶ 18).  EVL, on the other hand, maintains that "the Greek government did not act to alter the name of Eagle Van Lines as its freight forwarder until such time on or after March 15, 2010.  The shipments to Eagle Van Lines continued until approximately May 10, 2010 again, without [their] solicitation or involvement, in causing the items to be forwarded to [EVL's] warehouse." (ECF No. 35-2 ¶ 13).  Plaintiffs believe that EVL wrongfully continued to *accept* goods on behalf of the Hellenic Armed Forces and refused to turn them over to Stellar Maritime without first receiving compensation on all unpaid invoices and storage fees.  EVL holds a different view, stating that it "remained on the government['s] Military Assistance Programs Address Directory (MAPAC) for some period of time up to March 15, 2010, if not later, which resulted in the shipment to Eagle

---

Kobothleklas, commander of forwarding division, Mr. Klothakis, the liaison officer of the Hellenic Air Force, Mr. Yialamidis, director in the directorate of economics and also a director of the Hellenic Air Force support command finance directorate during the period within Spring 2010 until the Spring 2011, Mr. Georgopoulos, Air Attache to the Greek Embassy, Mr. Dimitrios Kafetzopoulos, procurement division to Greek Embassy 2009 to 2012." (ECF No. 35-2 ¶ 11).

Van Lines of items for the Greek government.  Many of those items were shipped Code 4, meaning the freight charges had to be paid on delivery." (ECF No. 35-3 ¶ 10).

EVL continues to store many items in its warehouse that it received during varying time periods.  Defendant maintains that as of May 5, 2014, "Eagle Van Lines is owed $1,697,233.90 in total unpaid invoices of which $1,577,430.70 is due under Contract 100/09 and for the period between December 1, 2009 to February 24, 2010, together with interest, storage, freight charges and carrier charges." (ECF No. 35-2 ¶ 18).  According to Plaintiffs, the military goods and equipment held by EVL include: military transport airplanes; military helicopters; training aircrafts for pilot officers; aircraft spare parts; and ground support equipment. (ECF No. 3 ¶ 32).[6]

---

[6] Plaintiffs assert that EVL is holding the disputed goods in storage facilities in Temple Hills, Maryland and Jamaica, New York. (ECF No. 3 ¶ 33).  In October 2013, as part of the discovery process in this action, Konstantinos Vlassis, Colonel in the Hellenic Air Force and the Director of the General Staff's Logistics Directorate, "supervised and participated in an inspection and inventory of the goods and equipment [allegedly] belonging to [the Hellenic Armed Forces] and to the Hellenic Army and Hellenic Navy that is being held by [EVL] in its storage facility in Temple Hills, Maryland." (ECF No. 30-12 ¶ 3).  Both parties attach various spreadsheets to their motions reflecting the materials allegedly held by EVL.  As will be discussed below, there appears to be inconsistency in the parties' records as to the total number of items held by EVL and the dates of receipt. (*See, e.g.*, ECF No. 37-4, at 5-35).  EVL apparently has no record of receiving at least some of the goods Plaintiffs accuse it of holding.

### B.   Procedural Background

Plaintiffs filed a complaint on March 18, 2013. (ECF No. 1). They filed an amended complaint on June 14, 2013, asserting the following causes of action: (1) conversion (count I); and (2) breach of contract (count II). Plaintiffs seek declaratory judgment and injunctive relief, which they designate as counts III and IV of the amended complaint. (ECF No. 3). Defendant answered the complaint (ECF No. 7), and counterclaimed against Plaintiffs for breach of contract (ECF No. 8). Defendant requests a declaratory judgment and punitive damages, which relief it includes as separate causes of action. (ECF No. 8, at 5-6). Plaintiffs answered the counterclaim on August 9, 2013. (ECF No. 12).

Plaintiffs moved for partial summary judgment on April 15, 2014. (ECF No. 30). Defendant opposed the motion and also cross-moved for partial summary judgment. (ECF Nos. 35 & 36). Plaintiffs filed a reply in further support of their motion for partial summary judgment in which they opposed Defendant's cross-motion. (ECF No. 37).

## II.  Standard of Review

Both parties request partial summary judgment. Rule 56(a) of the Federal Rules of Civil Procedure, permits a party to move for summary judgment or partial summary judgment by identifying "each claim or defense — or the *part* of each claim or defense —

on which summary judgment is sought." (emphasis added). "[P]artial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication . . . serves the purpose of speeding up litigation by" narrowing the issues for trial to those over which there is a genuine dispute of material fact. *Rotorex Co. v. Kingsbury Corp.,* 42 F.Supp.2d 563, 571 (D.Md. 1999) (internal quotation marks omitted) (noting that "numerous courts have entertained and decided motions for partial summary judgment addressing particular issues").

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment. *Celotex,* 477 U.S. at 322–23.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

14

Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

### A.   Plaintiffs' Motion for Partial Summary Judgment

### 1.   Plaintiffs' Claims

Plaintiffs argue that they are "entitled to summary judgment *on [their] claim to recover the goods held by EVL* and to summary judgment as to liability *on [their] claims for damages*." (ECF No. 30-1, at 15) (emphases added). Plaintiffs' amended complaint essentially contains claims for breach of contract and conversion; Plaintiffs also request injunctive and declaratory relief as separate counts in the amended complaint. (ECF No. 3, at 6-8). Plaintiffs seek the return of their property that they allege was converted, but do not clearly reference the legal mechanism for obtaining such relief. Plaintiffs' motion states:

> A defendant who has tortuously detained personal property belonging to the plaintiff may be ordered to return the property. Such a remedy is commonly granted by way of a writ of replevin. *Although the complaint here seeks to recover the goods from EVL by a different route – a request for injunctive relief, in conjunction with a claim for conversion – the difference is one of terminology, not of substance. Regardless*

15

> *of how the claim is labeled, the fact is that the Court can and should direct EVL to return the goods to [Plaintiffs].*

(ECF No. 30-1, at 25) (emphasis added).  Plaintiffs have not supplied any authority for the proposition that the court can direct the return of property irrespective of whether they have instituted a replevin action.  Indeed, in *Wallander v. Barnes*, 341 Md. 553, 561 (1996) – a case cited by Plaintiffs – the court commented that "[t]he issue of the proper measure of damages *necessarily involves classifying the cause of action*, at least as to whether it is replevin, and, if so, the extent to which damages are awardable in replevin."[7]  (emphasis added).  Plaintiffs are the "master[s] of [their] complaint," and must properly plead causes of action which would entitle them to the relief sought.  *Custer v. Sweeney*, 89 F.3d 1156, 1165 (4th Cir. 1996); *EDI Predcast, LLC v. Carnahan*, 982 F.Supp.2d 616, 632 (D.Md. 2013) ("But it is not clear that Plaintiff ever has thought seriously about the nature of its claims, the necessary elements and proofs, or even the simple question of what forms of damages it expects to collect *and how*, even though such consideration is required by Fed.R.Civ.P. 11(b).  Neither party's summary judgment briefing provided a detailed (or, in

---

[7]  Both parties cite to Maryland law throughout their memoranda, conceding that Maryland law applies notwithstanding Article 25.1 of Contract No. 100/09, which states that "[a]ny claim or dispute concerning the interpretation, performance or validity of this Contract will be governed by [] Greek laws."

many cases, even a sufficient) discussion of the elements and proofs required to make out a claim.") (emphasis added).

Judge Blake explained in *Sprint Nextel Corp. v. Simple Cell, Inc.*, Civ. No. CCB-13-617, 2013 WL 3776933, at *8 (D.Md. July 17, 2013):

> In Maryland, the common law tort of conversion contains two elements. First, the plaintiff must prove the defendant exerted "any distinct ownership or dominion . . . over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 260 (2004) (quotation omitted). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* Second, the defendant must have "an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 836. Similarly, an action for replevin permits a plaintiff to recover "personal property that is wrongfully detained by the defendants." *Ganter v. Kapiloff*, 516 A.2d 611, 612 (Md.App. 1986); *see also McClung-Logan Equipment Co. v. Thomas*, 172 A.2d 494, 498 (Md. 1961) ("[I]n order to maintain an action of replevin the plaintiff must prove his right to immediate possession at the time the writ issues.").

Importantly, "[t]he measure of damages in an action for conversion of personal property [generally] is the fair market value of the property at the time of conversion, with legal interest thereon to the date of the verdict." *Transpacific Tire & Wheel, Inc. v. Orteck Intern., Inc.*, Civ. Action No. DKC 2006-

0187, 2010 WL 1375292, at *12 (D.Md. Mar. 30, 2010) (*quoting Keys v. Chrysler Credit Corp.*, 303 Md. 397, 415 (1985)). "When [] the value of the property detained is the same upon its return, [] damages are measured by the loss of use of the property." *Postelle v. McWhite*, 115 Md.App. 721, 728 (1997). An action for replevin, on the other hand, "is designed to obtain possession of personal property that is wrongfully detained by the defendant." *Ganter*, 69 Md.App. at 100;[8] *Wallander*, 341 Md. at 561 ("Replevin 'may be said to be the appropriate remedy in all cases where the object of the suit is to recover possession of specific goods and chattels, to the possession of which the plaintiff claims to be entitled at the time of instituting the suit.'") (*quoting* 2 J. Poe, *Pleading and Practice* § 425, at 417 (1925 Tiffany Ed.)).

Assuming Plaintiffs could obtain the requested relief (*e.g.,* release of goods held by EVL) via a conversion claim, they must show that Defendant's detention of the property is wrongful. "[T]he gist of a conversion is not the acquisition of the property by the wrongdoer, but the *wrongful deprivation* of a person of property to the possession of which he is entitled."

---

[8] Interestingly, *Ganter* is a case cited by Plaintiffs for the proposition that a defendant who tortuously detains personal property may be ordered to return it. *Ganter* was an action for replevin, however, not conversion.

*Baltimore & O.R. Co. v. Equitable Bank, N.A.*, 77 Md.App. 320, 325 (1988).  Plaintiffs argue:

> In considering the parties' contractual rights and duties, it is necessary to consider three separate periods of time, *because the source and extent of those rights and duties differed during each period:*
>
> 1. the period through the expiration of Contract 100/09 on November 30, 2009,
>
> 2. the period from December 1, 2009 through February 12, 2010[9] – i.e., between the expiration of Contract 100/09 and the termination of EVL's services, and
>
> 3. the period after the termination of EVL's services.

(ECF No. 30-1, at 15) (emphasis added).

### a.  **March 1, 2009 – November 30, 2009 (Contract No. 100/09)**

It is undisputed that Contract No. 100/09 covered Defendant's provision of freight-forwarding services from March 1, 2009 through November 30, 2009.  (ECF No. 30-4 ¶ 6).  The contract expired on September 30, 2009, but obligated EVL to continue to receive and forward materials for two months after the expiration date under the same terms and condition, thus

---

[9]  Although the letter from the Minister of Defense terminating EVL's services is dated February 12, 2010, it states that the discontinuation of EVL's services is "effective upon receipt of the present resolution."  (ECF No. 30-11, at 4).  Defendant contends that Mr. Georgakopoulos received the February 12, 2010 letter on February 24, 2010.  (*See* ECF No. 35-2 ¶ 13).  Accordingly, the termination became effective on February 24, 2010.

Contract No. 100/09 terminated on November 30, 2009. (*Id.*).
Plaintiffs are correct that Contract No. 100/09 did not
condition Defendant's delivery of goods on Plaintiffs'
satisfaction of their payment obligations under the contract.
Article 4.5.1.4 of Contract No. 100/09 states that EVL's
obligations include "forwarding of the materials in the U.S.A.
*within three days* from their arrival to their final recipient
within the U.S. [] by air or by road depending on the orders of
the Hellenic Armed Forces." (ECF No. 30-6, at 9) (emphasis
added). Similarly, Article 16.1 of Contract No. 100/09 states:

> The maximum time from the date the
> contractor [EVL] will receive the materials
> in the U.S.A. until the date of shipment
> bound for Greece [] of the Armed Forces or
> the Air Force *will be three (3) business
> days* from the date of their customs
> clearance. . . . Similarly, for materials
> destined to various parts of the U.S.A. and
> materials originating in Greece, the maximum
> time will be three (3) working days from
> their arrival and their customs clearance at
> U.S. airports.

(*Id.* at 25) (emphasis added). The payment terms in Contract No.
100/09, on the other hand, require Plaintiffs to repay EVL
within two (2) months from receiving an invoice and all
supporting documentation. Specifically, Article 8.3 states:

> The Military Attaches will repay the
> CONTRACTOR [EVL] in U.S. dollars for the
> services rendered by the contractor, *within
> two (2) months at the latest from the date
> they received the required supporting
> documents*, as the case may be, which the

> competent Services will receive in Greece,
> provided that a relevant inspection
> determines that they are appropriate.

(ECF No. 30-6, at 19) (emphasis added).   Mr. Georgakopoulos,
EVL's President, also testified that Contract No. 100/09 did *not*
permit any fees for storage and did not allow EVL to "withhold
goods and not forward them on." (ECF No. 30-26, at 5, 9).

Defendant appears to argue that its retention of goods
received during the period when the parties were governed by
Contract No. 100/09 is justified by way of two statutory liens:
a warehouseman's lien and carrier's lien.   It states, "EVL has
the right to exercise both a [w]arehouse[man's] lien and a
[c]arrier's lien *for its pre-payment of transportation and other
associated charges in fulfillment of its duties under the
parties['] contract* and post contract actions." (ECF No. 35-1,
at 12) (emphasis added).   Defendant contends that "a statutory
warehouseman's lien can be created on goods covered by a bill of
lading, which were shipped to EVL." (*Id.* at 13).   Defendant
also asserts that as a freight forwarder, EVL "had to be
involved in the storage of goods. . . . There can be no question
that EVL['s] duties include holding and safekeeping the goods
and its work in this capacity includes storing." (ECF No. 35-1,
at 13-14).   Thus, Defendant seems to take the position that
because it performed certain storing functions under the
contract, it could withhold goods in storage (that it received

21

during the time period when Contract No. 100/09 governed the parties' relationship) until Plaintiffs paid outstanding invoices.

Plaintiffs disagree that any lien applied during the period when the parties' dealings were governed by Contract No. 100/09. As Plaintiffs contend, "[g]iven how quickly EVL was supposed to forward goods after receiving them, its intended role as a forwarder was by its nature inconsistent with any suggestion that it has been retained to provide storage services." (ECF No. 30-1, at 24). Indeed, EVL's President testified during his deposition that there was "no storage involved" under the terms of Contract No. 100/09. Even if EVL performed storage functions in its capacity as freight forwarder *generally*, under the terms of Contract No. 100/09, it was obligated to forward goods it received within three (3) business days; nothing in the contract suggests that it could condition the release of goods it was required to forward within three (3) business days on payment of outstanding invoices by Plaintiffs. Indeed, Article 4.5.1.1 of Contract No. 100/09 states that EVL's obligations included:

> Receives the cargo from the customs clearance area of the A/P "El. Venizelos" and *provides for their transportation by air to the distribution center in the U.S.A., in appropriate storage areas approved for storage of classified materials by the appropriate U.S. Services*, ensures the provision of the necessary means for loading and unloading and the appropriate

> transportation means to easily receive,
> safely retain and transport the materials
> they received for further forwarding up to
> their final recipient within the U.S.A.

(ECF No. 30-6, at 8) (emphasis added).  Similarly, Article
4.5.2.3 of Contract No. 100/09 states that EVL:

> Pays the airfare for the transportation of
> the materials from the U.S.A. to Greece and
> other expenses (such as expenses to keep –
> store the materials at the exporting A/P,
> *storage expenses* of the A/L, etc.

(*Id.* at 9) (emphasis added).  Any storage functions performed by

EVL were built into the express terms of the contract, but did

not entitle EVL to *withhold* goods received during the contract

period until Plaintiffs paid outstanding invoices.  The idea

that EVL could assert any lien on the goods it received during

the effective period of Contract No. 100/09 is inconsistent with

its obligations to forward such goods within three (3) business

days under the terms of its express contract with Plaintiffs.

*See, e.g., Clark Bros & Co. v. Pou*, 20 F.2d 74, 76 (4th Cir.

1927) ("A lien cannot arise, where, from the nature of the

contract between the parties, it would be inconsistent with the

expressed terms or the clear intent of the contract" (*quoting*

*Randel v. Brown*, 43 U.S. 406 (1844)).

Insofar as Defendant holds goods in storage that were

received during the effective period of Contract No. 100/09 –

from March 1, 2009 until November 30, 2009 – Plaintiffs are

entitled to the release of such goods.   A dispute remains, however, regarding what goods were received during this time period and when they were received, which precludes the court from ordering any property released at this stage.[10]

### b.   December 1, 2009 – February 24, 2010

The next issue is how the parties' relationship was governed after the termination of Contract No. 100/09. Konstantinos Katirtzidis,[11] a Captain in the Hellenic Air Force General Staff assigned to the Economics Directorate, declared that in the middle of December 2009, after Contract No. 100/09 had expired, "[Plaintiffs] and EVL engaged *in negotiations* regarding the terms of a contract [Contract No. 47/10] that would govern the period from December 1, 2009, until the activation of the new contract with [Imperio-Argo.]"   (ECF No.

---

[10] The spreadsheets which are part of the record provided by the parties differ over the date EVL received certain goods, which impacts the parties' obligations.   An updated spreadsheet provided by Plaintiffs reflecting the universe of goods purportedly held by EVL (ECF No. 37-4) reflects some discrepancies between the dates Plaintiffs attest an item was received as compared to the date provided by EVL.   Moreover, for some of the items, the column "Date Received According to EVL Records" shows EVL not having received certain items at all. Furthermore, for about a dozen items, the date received by EVL according to Plaintiffs' records goes back to 2004 and predates Contract No. 100/09.   (*See* ECF No. 37-4, at 5).   At this stage, such inconsistencies in the parties' records preclude ordering any goods released.

[11] Captain Katirtzidis asserts that he "was involved in all aspects of the discussions, negotiations, and meetings in late 2009 and afterwards regarding [Plaintiffs'] dealings with [EVL]."   (ECF No. 30-4 ¶ 3).

30-4 ¶ 10) (emphasis added).   Capital Katirtzidis further states

in his affidavit:

> In   early   January   2010,   HAF   and   EVL
> tentatively   agreed   on   the   terms   of   a   new
> contract.   HAF   sent   EVL   a   draft   contract
> containing   those   terms,   *and   EVL   returned   a*
> *signed   copy   to   HAF   within   the   context   of   the*
> *negotiations      procedure,      for      final*
> *consideration   and   approval   by   the   Minister*
> *of   Defense.*

(*Id.* ¶ 11) (emphasis added).   EVL contends, however, that it

initialed a draft of Contract No. 47/10 only for purposes of

submitting  it  to  Plaintiffs  for  further  negotiation.    Mr.

Georgakopoulos of EVL stated:

> A. No. . . . [B]y initialing something, a
> document, it means that you have to submit
> this paperwork.   It's pretty much as a []
> verification,   *a   verification   that   you*
> *submitted   that   document.*   []  [A]  lot  of
> other  countries  use  exactly  the  same
> process.   But [] *it's not a contract until*
> *it's really signed.*
>
> Q: But if you had found any of the terms
> objectionable, you would not have initialed
> the contract, correct?
>
> A: Not  necessarily,  because  usually  those
> contracts  would  get  negotiated  before  even
> they get signed.
>
> Q: So  your  answer  that  the  draft  was
> negotiated and signed by Eagle Van Lines and
> George Georgakopoulos is not accurate?
>
> A: *The draft was negotiated and actually not*
> *signed.*   It should say, you know, we place
> our initials on it.   That's it.

> Q: And why did you place your initials on it?  What does that mean?
>
> A: This is a part of the process.   []
> Anything you submit, you have to put your
> initials on it.
>
> Q: So you submitted it?
>
> A: Submit, yeah.  Submit only.

(ECF No. 30-26, at 7) (emphases added).  Plaintiffs reference portions of Mr. Georgakopoulos's testimony stating that the terms of Contract No. 47/10 were offered by EVL to HAF for acceptance, and that such terms were accepted because HAF took the benefit of the offer.  (ECF No. 30-1, at 18).  In his deposition testimony, however, Mr. Georgakopoulos stated that the terms offered would have been renegotiated and would not have comprised the final, binding contract:

> Q: Under Article 5 in 47/10, Declaring the
> Contractor in Default, Eagle Van Lines is in
> default if it does not fulfill its
> contractual obligations, it says, which
> includes in particular continuous failure to
> timely transport the materials within the
> specified time limits of the present terms.
> [Article 5.1]  . . . [I]f this contract had
> been in effect, isn't it true that [] the
> fact that Eagle Van Lines withheld goods
> received during the time of this contract
> would have put it in default under Article
> 5?
>
> A: No
>
> Q: And why is that?
>
> A:  Hypothetically, *if this contract was
> going to be signed*, it definitely would have

26

been renegotiated.  Therefore, none of this
would have been in here, I promise you that,
because by then when they invite us back to
go and sign the contract in April we already
had the experience.  So we wouldn't sign
something [that] wouldn't have any storage
fees included.

(ECF No. 30-26, at 8-9) (emphases added).

The parties dispute whether Contract No. 47/10 was finally
executed by both sides, but this disagreement does *not* create a
genuine dispute of material fact with respect to whether EVL's
detention of goods received during this time period was
wrongful.  Even if Contract No. 47/10 was not in effect, the
parties continued to operate under the same terms as Contract
No. 100/09 with respect to shipment of goods and payment for
freight-forwarding services by Plaintiffs.  Indeed, Mr.
Georgakopoulos testified during his deposition that from
December 1, 2009 until February 24, 2010, EVL continued to ship
goods "with no issues until the [termination] decision [from]
Mr. Venizelos [the Minister of National Defense] came up." (ECF
No. 30-26, at 12).  Mr. Georgakopoulos further testified that
EVL continued billing under the terms of Contract No. 100/09.
(*Id.*).  Regardless of whether the parties' dealings were
governed by Contract No. 100/09 or 47/10 during this time
period, neither contract allowed EVL to condition the release of
goods received from December 1, 2009 until February 24, 2010 on
payment of all outstanding invoices by Plaintiffs.  Much like in

Contract No. 100/09, the terms of Contract No. 47/10 required EVL to forward the goods within three (3) business days, and Plaintiffs had to pay within two (2) months from receiving all supporting documentation. (*See* Articles 3.3 and 9.5.a(4) of Contract No. 47/10). Thus, the same reasons discussed above for why Defendant cannot assert a statutory lien during the parties' contractual period also apply for the period from December 1, 2009 through February 24, 2010.

Based on the foregoing, Plaintiffs have a right to the release of goods received from December 1, 2009 to February 24, 2010. Insofar as the parties agree on the goods that EVL received prior to February 24, 2010, those goods should be released, but the court will not order any goods released until the exact items held by EVL that were received during this time period can be ascertained. A telephone conference will be held with the parties to determine whether they can agree on the exact goods to be released.

### c.   Post-Termination Period (Post-February 24, 2010)

Plaintiffs argue that for the time period following the termination of Defendant's services, EVL was not authorized to accept shipment of goods and had no right to condition release of the goods on payment of outstanding invoices by Plaintiffs. (ECF No. 30-1, at 19).

Captain Katirtzidis declared that "[a]fter terminating EVL's services as freight forwarder, [Plaintiffs] took steps to ensure that goods would no longer be shipped to EVL. Those steps included notifying the U.S. agency that oversees the FMS program and various commercial vendors. *But despite those steps, some goods continue to be shipped to EVL.*" (ECF No. 30-4 ¶ 18) (emphasis added). Captain Katirtzidis also states that after February 12, 2010, "EVL no longer had any authority to accept goods on behalf of the Hellenic Armed Forces," but nevertheless continued to receive the goods and refused to turn them over to Plaintiffs unless it first was paid on all outstanding invoices. (ECF No. 30-4 ¶ 19). Defendant tells a different story. Mr. Georgakopoulos, EVL's President, states that on February 24, 2010, by hand delivery and by email, he received the letter from Plaintiffs terminating their relationship. (ECF No. 35-2 ¶ 13). He states that after the termination, EVL still continued "to receive shipments of military goods, freight collect, meaning we paid on the delivery on behalf of the Hellenic Armed Forces." (Id.). Mr. Georgakopoulos further avers:

> At no time did Eagle Van Lines prepare or cause to be prepared any of the bills of lading forwarding those items to our warehouse. To the best of my knowledge, information and belief *the Greek government did not act to alter the name of Eagle Van Lines as its freight forwarder until such*

> time on or after March 15, 2010. *The*
> *shipments to Eagle Van Lines continued until*
> *approximately May 10, 2010 again, without*
> *our solicitation or involvement, in causing*
> *the items to be forwarded to our warehouse.*
> The freight collect charges were paid, the
> items were stored, Hellenic Armed Forces was
> notified.  Eagle Van Lines has paid out in
> freight collect charges $19,064.40 for goods
> shipped to us after February 24, 2010.

(*Id.*) (emphasis added).  Stephanie Bo, an international

coordinator for Eagle Van Lines, also declares:

> Eagle Van Lines remained on the
> government['s] Military Assistance Programs
> Address Directory (MAPAC) for some period of
> time up to March 15, 2010, if not later,
> which resulted in the shipment to Eagle Van
> Lines of items for the Greek government.
> Many of those items were shipped Code 4,
> *meaning the freight charges had to be paid*
> *on delivery.*  Under Title 49[,] our ability
> to serve our customer base, not necessarily
> simply the Greek government, would be
> jeopardized and could be suspended if we
> rejected and did not pay a freight collect
> delivery.

(ECF No. 35-3 ¶ 10).  Thus, there is a genuine dispute regarding

whether EVL could have or should have rejected the goods it

received after February 24, 2010 and whether EVL's continued

acceptance of the goods after the termination of its

relationship with Plaintiffs is attributable to Plaintiffs' own

failure to ensure that the goods would be forwarded elsewhere.

Plaintiffs contend that "even if one assumes that EVL had a

valid excuse for continuing to accept delivery of goods

addressed to [Plaintiffs] after its services were terminated,

and even if it has a claim against [Plaintiffs] for freight-collect payments with respect to those deliveries, it would not follow that EVL was entitled to retain the goods in the face of [Plaintiffs'] instructions that they be forwarded to Stellar Maritime." (ECF No. 30-1, at 20). Plaintiffs cite *T.R. Ltd. v. Lee*, 55 Md.App. 629 (1983), in support of their argument that even if HAF was indebted to EVL for unpaid invoices, Defendant had to release the goods once Plaintiffs demanded that they be forwarded to Stellar Maritime. In *Lee*, a stolen tractor-trailer ran off a ramp connecting two interstate highways. A Maryland State police officer directed T.R. Ltd., trading as Raley's Emergency Road Services, to unload, right, tow and store the vehicle. Agent of the owner and lessor of the tractor-trailer made a demand for its return, but Raley's refused such demand until all assessed towing and storage charges were paid. The Court of Special Appeals of Maryland held that "[i]n the absence of some common law or statutory lien authorizing it to retain possession of the property until its charges were paid, [the towing company] was obliged to restore the property to its owner when demand was made for its return on November 25, 1980, and there was no right to charge for storage of the property beyond that date."[12] *Id.* at 634.

---

[12] The court noted in *Lee*, 55 Md.App. at 634, that a common law possessory lien has been "defined as the right in one man to

Plaintiffs argue that EVL could not retain possession of the goods absent a valid lien.   EVL counters that it had a warehouseman's and carrier's lien, which entitled it to hold the goods until Plaintiffs satisfied their unpaid invoices.   (ECF No. 35-1, at 13-24).   Plaintiffs dispute the applicability of both types of liens.

### i. Warehouseman's Lien

In Maryland, a warehouseman's statutory lien is conferred by Md. Code Ann., Com. Law § 7-209.   Section 7-209(a) states, in relevant part:

> A warehouse has a lien against the bailor *on the goods covered by a warehouse receipt or storage agreement* or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

(emphasis added).   Plaintiffs assert that the goods at issue are not covered by either a warehouseman's receipt or a storage

---

retain that which is in his possession belonging to another till certain demands of him the person in possession are satisfied." (*citing* Brown, *The Law of Personal Property*, § 107 (2[d] ed. 1955) (internal quotations omitted).   "The basis of such a [common law possessory] lien is an agreement, express or implied, between the parties."   *Id.*   Here, EVL does not contend that a common law possessory lien entitled it to retain the goods after Plaintiffs terminated its services.

agreement, "and therefore the essential predicate of a warehouseman's lien is missing." (ECF No. 30-1, at 21).[13]

It is undisputed that after February 24, 2010 – when EVL received Plaintiffs' February 12, 2010 letter terminating its services – the parties' relationship was not governed by any contract or agreement. Thus, EVL's contention that it could retain the goods received after February 24, 2010 pursuant to a warehouseman's lien turns on whether the goods are covered by a "warehouse receipt."[14] The version of Md. Code Ann., Com. Law § 1-201 that was in effect until May 31, 2012 defined a warehouse receipt as "a document of title issued by a person engaged in the business of storing goods for hire." *See id.* § 1-201(45). The version of Section 1-201 that became effective on June 1, 2012 defines a "warehouse receipt" as "a receipt issued by a person engaged in the business of storing goods for hire." Md. Code Ann., Com. Law § 1-201(42). Section 7-202 states that "[a]

---

[13] Plaintiffs also state that "EVL has no lien with respect to the goods it received after its services were terminated[] because it had no authority to accept the goods in the first place." (ECF No. 30-1, at 21). As explained above, there is a genuine dispute of material fact regarding whether EVL wrongfully accepted the goods after its services were terminated.

[14] In its opposition to Plaintiffs' motion for partial summary judgment, Defendant states that "the question is not whether there is a 'warehouse receipt [] but rather whether EVL had the right to assert a lien under [Section] 7-209." (ECF No. 35-1, at 14). Under Section 7-209, however, "[a] warehouse has a lien against the bailor *on the goods covered by a warehouse receipt or storage agreement*." Md.Com.Law Code Ann. § 7-209(a).

warehouse receipt need *not* be in any particular form."[15]   Md. Code Ann., Com. Law § 7-202(a) (emphasis added).   Section 7-202(b) states that "[u]nless a warehouse receipt embodies within its written or printed terms each of the following [items], the warehouseman is liable for damages caused by the omission to a person injured thereby."   Md. Code Ann., Com. Law § 7-202(b). The items include, *inter alia*, a description of the goods or of the packages containing them, the date of the issue of the receipt, and the location of the warehouse where the goods are stored.   Failure to include all of the terms only subjects the warehouseman to potential liability for damages caused by the omission of such terms to a person injured thereby; Section 7-202(2) does *not* prescribe the information that must be included in a warehouse receipt in order for a document to qualify as such.   *See, e.g.,* Md. Code Ann., Com. Law § 7-202 cmt. 1 ("The only consequence of a warehouse receipt not containing any term

---

[15]   Plaintiffs cite Hawkland U.C.C. § 7-202:1, which states that "for a warehouse receipt to qualify as a document of title, however, the receipt must meet the criteria of a document of title."   Plaintiffs then cite Hawkland U.C.C. § 7-101:2, which states that "the goods covered by a document of title must be sufficiently identified or described. . . .   Records which do not identify the goods, such as baggage check receipts and clothing check tokens, do not qualify as documents of title." Plaintiffs argue that the documents that EVL identifies as warehouse receipts do not qualify as such because none of them include a description of the goods that are covered by the receipt.   (ECF No. 30-1, at 23).   The applicable language from the *Maryland* statute controls, however, and any interpretation of U.C.C. provisions governing a warehouseman's lien – such as Hawkland U.C.C. - is not binding authority on this court.

listed in subsection (b) is that a person injured by a term's omission has a right as against the warehouse for harm caused by the omission.").

It is far from certain whether the document reproduced in Defendant's opposition brief purporting to be a warehouseman's receipt actually qualifies as such. (*See* ECF No. 35-1, at 15). The date of such receipt is not readily apparent from the reproduction, and it does not appear to provide any identification of the goods to which it pertains. Moreover, Plaintiffs provide documents which their attorney declares Mr. Georgakopoulos identified "as being a representative sample of EVL's warehouse receipt." (ECF No. 30-19 ¶ 6 & ECF No. 30-24). According to Plaintiffs, Exhibits D5 and E6[16] to their motion for partial summary judgment represent documents which Defendant contends qualify as warehouse receipts; the purported receipts, however, for the most part, are dated September 2008, which *predates* Contract No. 100/09. Defendant has not specifically referenced anything on the record that represent warehouse receipts issued after February 24, 2010 for the goods received following the termination of the parties' dealings, and it is EVL's responsibility to do so. *See, e.g., Johnson v. United States*, 861 F.Supp.2d 629, 634-35 (D.Md. 2012) (noting that it

---

[16] Exhibit E6 is not available on CM/ECF as it exists in hard copy only, which Plaintiffs have supplied.

is the obligation of the parties, not the Court, to locate and cite to the appropriate portions of the record that support the parties' arguments on summary judgment).

Defendant asserts, however, that "attached to each receipt [] are [r]equisition and [i]nvoice/[s]hipping [d]ocuments," and "the OMB form which supplies specific details and codes for the FMS." (ECF No. 35-1, at 15-16). Defendant does not supply legible copies of these documents, however, but contends that "such documentation is more than adequate to constitute a warehouse receipt." (*Id.* at 16). Plaintiffs dispute that the requisition and invoice/shipping documents or the OMB form were issued by EVL or that such documents qualify as warehouse receipts.

The only evidence on the record which suggests – albeit obliquely – that EVL issued warehouse receipts is deposition testimony from Mr. Georgakopoulos:

> Q: Did Eagle Van Lines provide the Hellenic government, including the armed forces, a warehouse receipt, for the goods at any time?
>
> A: Warehouse receipt, yes.
>
> Q: Yes.  And in what form was the warehouse receipt?
>
> A: It was handwritten.
> . . .
>
> A: *Usually the warehouse receipt [also] was attached to the item*. . . . Usually[,] a

36

copy of *the warehouse receipt was attached to the box, to every item that was shipped*.

. . .

Q: What information did this warehouse receipt [] contain? What's on it?

A: Usually – not always tracking number, usually from which tracking company came from, the number of pieces, the date that the item came in. It doesn't always necessarily have a tracking number because tracking number is too long. Now of course we have made a lot of modifications, it has all this information and everything's bar coded and our customer always ha[s] access to it through our system.

. . .

Q: *And to your understanding, was there a warehouse[] receipt for each item you have in the warehouse?*

A: *The majority of the time, yes.*

Q: *Were those receipts provided to the Hellenic government, those same receipts?*

A: Attached to the documents?

Q: Yes.

A: *I think so.*

Q: When would they have been given to the Hellenic government?

A: They were sending them with invoices.

(ECF No. 30-26, at 12-13) (emphases added). Plaintiffs dispute that EVL ever sent warehouse receipts to them for the goods it is holding, however, including goods received *after* February 24,

2010. Plaintiffs supply a declaration from Andreas Nikomanis, Captain in the Hellenic Armed Forces, stating that "EVL has never submitted to HAF any documents purporting to be warehouse receipts or bills of lading with respect to the goods belonging to HAF that are in EVL's possession." (ECF No. 37-3 ¶ 4). Captain Nikomanis further avers that "[w]ith respect to the goods belonging to HAF that are in EVL's possession, EVL has never submitted to HAF any documents of the type reproduced on pages 15, 16,[17] and 23 of EVL's [opposition] memorandum." (*Id.* ¶ 5). Although Defendant ultimately will need to come forward with much more proof to show that a warehouseman's lien attached to the goods in storage that EVL received after February 24, 2010, drawing all inferences in favor of EVL, there is a genuine dispute of material fact regarding whether such goods are covered by a warehouse receipt.

Plaintiffs argue in their reply memorandum that "[a]ssuming EVL has a lien, as to any given item the lien extends only to charges associated with that item; it does not also secure the payment of charges associated with different items." (ECF No. 37, at 13). Md. Code Ann., Com. Law § 7-209(a) states, in relevant part:

---

[17] The documents reproduced on pages 15 and 16 are those referenced above that Defendant asserts support that it issued warehouse receipts.

> If the person on whose account the goods are
> held *is liable for similar charges or*
> *expenses in relation to other goods whenever*
> *deposited and it is stated in the warehouse*
> *receipt or storage agreement that a lien is*
> *claimed for charges and expenses in relation*
> *to other goods, the warehouse also has a*
> *lien against the goods covered by the*
> *warehouse receipt* or storage agreement or on
> the proceeds thereof in its possession *for*
> *those charges and expenses, whether or not*
> *the other goods have been delivered by the*
> *warehouse.*

(emphases added).   The comments to the statute explain the distinction between a specific and general lien under the statute:

> [A] specific lien attaches automatically
> *without* express notation on the receipt or
> storage agreement *with regard to goods*
> *stored under the receipt* or the storage
> agreement.   *That lien is limited to the*
> *usual charges arising out of a storage*
> *transaction.*
>
> . . .
>
> [B]*y notation on the receipt or storage*
> *agreement, the lien can be made a general*
> *lien* extending to *like charges* in relation
> to other goods.

*Id.* cmt. 1 (emphases added).   Plaintiffs believe that EVL must be asserting a general lien "since it is withholding goods to secure the payment of charges associated with goods that it had previously delivered to HAF."  (ECF No. 37, at 13).

A specific lien entitles the warehouseman to *fees relating specifically to goods remaining in the warehouse* for which

warehouse receipts had been issued.  A general lien attaches to any goods in the warehouseman's possession, regardless of whether the charges asserted relate to those goods, but whether a general lien exists depends on the language in the warehouse receipt.  *See, e.g., In re Julien Co.*, 141 B.R. 359, 368 (Bkrtcy.W.D.Tenn. 1992) ("Clearly, the terms of UCC § 7-209(1), when ascribed their ordinary natural meanings, dictate that warehousemen may in fact assert a lien on goods in their possession for like charges or expenses in relation to other goods received from the same depositor if a warehouse receipt was issued and if [] it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods whether or not the other goods have been delivered elsewhere." (internal quotation marks omitted)).

The parties' memoranda leave much to be desired with respect to the impact of a specific or general lien and whether EVL can condition release of goods received after February 24, 2010 on Plaintiffs' satisfaction of invoices issued in connection with pre-February 24, 2010 goods on which there was no lien.  At this juncture, it cannot be said as a matter of law that Defendant does not have a warehouseman's lien on goods received after February 24, 2010.

40

### ii. Carrier's Lien

Defendant also asserts that a carrier's lien, Md. Code Ann., Com. Law § 7-307, entitles it to retain the goods it received after February 24, 2010. (ECF No. 35-1, at 22). In their reply, Plaintiffs preliminarily argue that EVL only proposed its carrier's lien theory for the first time at the summary judgment stage and that this theory should be rejected. There is no indication that EVL discovered for the first time at the summary judgment stage that a basis existed to assert a carrier's lien defense, but, nevertheless, Plaintiffs have had an opportunity to respond to the merits of this theory in their reply.

Md. Code Ann., Com. Law § 7-307 covers carrier's lien:

> (a) A carrier has a lien *on the goods covered by a bill of lading* or on the proceeds thereof *in its possession* for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law.
>
> . . .
>
> (c) A carrier loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver.

(emphasis added). A "bill of lading" means "a document evidencing the receipt of goods for shipment issued by a person

engaged in the business of transporting or forwarding goods."
Md.Com.Law Code Ann. § 1-201(b)(6).  The comments to Section 7-307 explain:

> 1. *The section is intended to give carriers a specific statutory lien for charges and expenses* similar to that given to warehouses by the first sentence of Section 7-209(a) and extends that lien to the proceeds of the goods as long as the carrier has possession of the proceeds.  But because carriers do not commonly claim a lien for charges in relation to other goods or lend money on the security of goods in their hands, *provisions for a general lien or a security interest similar to those in Section 7-209(a) and (b) are omitted.*
>
> 3. The carrier's specific lien under this section is a possessory lien. . . .  The carrier's lien arises *when the carrier has issued a bill of lading.*

Md.Com.Law Code Ann. § 7-307, cmts. 1, 3 (emphases added).

*Darby v. Baltimore & O.R. Co.*, 259 Md. 493, 498 (1970), explained:

> As we see it, [] two conditions must be met if the carrier is to claim a [carrier's] lien under the U.C.C.   First, the lien attaches only to 'goods covered by a bill of lading,' § 7-307(1).  Second, the lien may be lost on goods voluntarily delivered by the carrier, § 7-307(3).  'The validity of the carrier's specific lien is dependent on continuous possession.  If the carrier voluntarily gives up possession of the goods, the lien is lost.'

Defendant argues that "[i]n this case[,] there were goods that EVL paid for transportation and in some cases provided the

transportation, pursuant to a bill of [lading]." (ECF No. 35-1, at 22). In its opposition, Defendant reproduces a copy of what it purports to be a bill of lading, but does not produce specific evidence that establishes EVL's entitlement to a carrier's lien. (*Id.* at 23). In cases where EVL paid for transportation costs of another carrier, "it was the carrier that issued the bill of lading and provided the transportation that had a lien, and that carrier gave up the lien when it delivered the goods." (ECF No. 37, at 12). As for situations where EVL "provided the transportation," again, EVL does not offer any specific information as to what goods it transported, when, and whether it issued a bill of lading for such goods. A carrier's lien is specific, thus EVL needed to have issued a bill of lading for all the goods received after February 24, 2010. Defendant has supplied no evidence that any bills of lading were issued with respect to the items EVL is holding. *See, e.g., Lee*, 55 Md.App. at 636 ("It appears, however, that the tractor-trailer was not covered by a bill of lading, as is required to establish a carrier's lien. Bills submitted to the owner for towing and storage costs to date, cannot, we think, be considered bills of lading; there is no evidence that the bills dated at least six weeks after the vehicle was towed purported to be an acknowledgement of receipt of the vehicle, a contract

of carriage, or a document of title."). Accordingly, Defendant has not established a carrier's lien.

### d.  Damages

Finally, Plaintiffs contend that "EVL is also liable for damages due to its wrongful detention of the property." (ECF No. 30-1, at 25). Plaintiffs state that they do not "seek in this motion to have [their] damages quantified, but merely ask[] for a finding that EVL is liable for damages in an amount to be proved at trial." (Id. at 26). As discussed above, however, there are genuine disputes of material fact regarding whether Defendant's retention of goods received after February 24, 2010 is wrongful. Moreover, insofar as Plaintiffs seek a ruling on Defendant's liability for damages, their motion is overly broad. Plaintiffs do not specify on what *cause of action* EVL is liable for damages. They also do not spend any time in their papers explaining how they have *proven* Defendant's liability for damages on any particular cause of action.

### 2.  Defendant's Counterclaims

With regard to EVL's counterclaims, Plaintiffs contend that the court should enter partial summary judgment in their favor on: (1) EVL's claim for storage fees; (2) EVL's claim with respect to those invoices received by HAF before January 23, 2010; and (3) on EVL's claim for punitive damages. (ECF No. 30-1, at 26).

Both parties' memoranda regarding EVL's counterclaims are problematic.  Again, the parties' arguments are framed in terms of the requested relief and not the causes of action pursuant to which the respective relief is sought.  For instance, Plaintiffs assert that they "have shown that EVL had no right to retain the goods and any cost that it has incurred in storing them constitute a self-inflicted wound."  (*Id.*).  For the reasons discussed above, there is a genuine dispute of material fact regarding whether EVL's retention of the goods was wrongful after February 24, 2010.  Accordingly, Plaintiffs' contention that Defendant is not entitled to storage fees as a matter of law is unavailing.

### a.   Statute of Limitations

Plaintiffs assert that "[w]ith regard to most of its invoices, EVL's *claim* is barred by the statute of limitations." (ECF No. 30-1, at 26) (emphasis added).  Plaintiffs contend that EVL filed counterclaims on July 16, 2013, and the statute of limitations was tolled for 115 days by agreement of the parties. (*See* ECF Nos. 30-20, 30-21, 30-22).  Plaintiffs take the position that "EVL's *counterclaim* is time-barred to the extent it accrued more than three years and 115 days before the filing of the counterclaim on July 16, 2013 – i.e., insofar as it accrued before March 23, 2010." (*Id.*) (emphasis added).

The statute of limitations is an affirmative defense that ordinarily must be pleaded and proven by the party asserting it. *See Newell v. Richards*, 323 Md. 717, 725 (1991) ("As a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit.").  The burden is on Plaintiffs to show that the statute of limitations has run. *See, e.g., Clifton D. Mayhew, Inc. v. Blake Const. Co., Inc.*, 482 F.2d 1260, 1262 (4th Cir. 1973) ("[T]he burden is upon the party pleading the statute of limitations as a defense to show by a preponderance of the evidence that the cause of action arose more than the statutory period before the action was instituted.").

Presumably, Plaintiffs lodge the statute of limitations argument with respect to the breach of contract counterclaim. In support of their breach of contract counterclaim, EVL asserts that "[u]nder the terms of Contract No. 100/09[, Plaintiffs] had a duty to pay the outstanding fees due to EVL on a monthly basis but, in fact, often failed to make its payments in a timely manner under the contract and currently has obligation due to EVL in the amount of $2.18 million and without justification is refusing to make payment of the invoices."  (ECF No. 8 ¶ 23).

Plaintiffs believe that the statute of limitations bars EVL's claims with respect to any invoices that were received by

the appropriate branch of the Hellenic Armed Forces *before* January 22, 2010, which would have made payment due within sixty days – March 23, 2010. Plaintiffs argue that timeliness should be measured as to each invoice that Defendant sues on, analogizing to the rule that when a debt is payable in installments, the statute of limitations runs separately on each installment that is not paid when it comes due. Plaintiffs believe that any payments made by them during the limitations period pertaining to a specific invoice did not toll the running of the statute as to other unpaid invoices.

"A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md. Code Ann., Cts. & Jud. Proc. § 5-101. In contract cases, the statute of limitations generally "begins to run from the date of the breach, for it is then that the cause of action accrues and becomes enforc[ea]ble." *Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157 (1975). Plaintiffs cite *Avery v. Weitz*, 44 Md.App. 152, 154-155 (1979), for the proposition that with a contract requiring payment in installments, the statute of limitations begins to run on each payment when that particular installment is due. *Avery* involved a promissory note requiring monthly payments in installments.

Plaintiffs incorrectly argue that the situation here is akin to a note payable in installments.  A note payable in installments involves an overall contract requiring fixed incremental payments to fulfill a total obligation due under the note.  Here, however, there was no overall contract that required Plaintiffs to pay a *fixed* sum to fulfill an overall obligation due under the contract.  Instead, the amount Plaintiffs had to pay on each invoice depended on the items received.  Plaintiffs contend that "[e]ach invoice represented a separate demand for payment that was independent of the other invoices, and any time an invoice was not paid by the time payment came due, a claim accrued for that amount."  (ECF No. 30-1, at 27).  Defendant maintains, however, that Plaintiffs were chronically late in paying the invoices, and did not abide by the payment obligations set forth in Contract No. 100/09. Mr. Georgakopoulos stated in his affidavit that "[f]rom prior to Contract 100/09 and continuing through May of 2010[,] Eagle Van Lines would often have to wait for unexplained long delays in the processing of its invoices and on several occasions included [] actual travel to Greece in an effort to have invoices processed and paid that had been long overdue."  (ECF No. 35-2 ¶ 9).  Ngai Siu, the accounting manager for Eagle Van Lines, also testified during her deposition that the Greek government would pay only parts of invoices in some cases.  (*See* ECF No. 35-13,

at 9).  Moreover, the declaration from Captain Nikomanis in the Hellenic Air Force indicates that Plaintiffs fulfilled outstanding invoices for a time period long after the termination of their dealings on February 24, 2010. He states: "[d]espite EVL's refusal to turn over to HAF the goods belonging to HAF that were in its possession, HAF continued for several months to make payments to EVL *on its outstanding invoices*." (ECF No. 30-17 ¶ 5).  His affidavit suggests that Plaintiffs continued to make payments until September 2010, for invoices that became due much earlier. (*Id.* ¶ 6).

Thus, the obligation to pay within two (2) months may have been altered by the parties' course of conduct, making it unclear when the obligation to pay by Plaintiffs became due (and consequently, when any cause of action for breach of contract accrued on each invoice).  Although applying Virginia law to the issue of the statute of limitations on a contract claim, the analysis in *Clifton D. Mayhew, Inc. v. Blake Const. Co., Inc.*, 482 F.2d 1260, 1262-63 (4th Cir. 1973), is helpful:

> In Virginia, [much like in Maryland], the statute of limitations on a contract begins to run from the time payment is due.  Of necessity, *the due date depends upon the terms, either expressed or implied, of the contract in issue*. . . .  The course of dealings between the parties may show their intent.

(emphasis added); *see also Government of United Kingdom of Great Britain and Northern Ireland v. Northstar Services, Inc.*, 1 F.Supp.2d 521, 524 (D.Md. 1998) ("A general principle of contract law allows for the parties' course of dealing to 'give meaning to' the terms of a contract.") (*quoting* Restatement (Second) of Contracts § 223). Here, each invoice constituted a separate bill for payment, but it is unclear when each bill became due considering the parties' course of dealings. Thus, Plaintiffs have not established that any of Defendant's claims for payment of invoices are time barred.[18]

---

[18] Defendant cites several dates in its opposition brief, but does not offer any explanation as to the import of these dates on the statute of limitations analysis. (See ECF No. 35-1, at 27-28).

Defendant further argues that "limitation was tolled by judicial exception." (ECF No. 35-1, at 28). EVL suggests that in some cases, the statute of limitations can be tolled by the filing of a claim in the wrong forum. (*Id.* at 28-30). Although neither party has provided the full procedural posture of this case prior to its inception in this court, Defendant maintains that "[t]he case in Greece was instituted in June 2010 and did not conclude until June 2011." (*Id.* at 30). Defendant cites to an excerpt from Mr. Georgakopoulos's deposition, in which he states that a witness testified in the case in Greece in 2010 that the invoices were not paid by Plaintiffs. (ECF No. 35-1, at 29-30). Defendant does not argue, however, that EVL asserted its *counterclaims* in the Greek lawsuit. Plaintiffs confirm that EVL did not assert its own claims against Plaintiffs in the case filed in Greece. (ECF No. 37-7 ¶ 5). Accordingly, the proceeding in Greece initiated by *Plaintiffs* does not toll the statute of limitations on claims asserted by EVL *against Plaintiffs* in the instant matter.

The burden to prove statute of limitations, an affirmative defense, is on Plaintiffs, however.

b.   **Punitive Damages**

In their motion for partial summary judgment, Plaintiffs argue that Defendant's claim for punitive damages is barred as a matter of law.  First, Plaintiffs contend that they are immune from liability for punitive damages under the Foreign Sovereign Immunity Act ("FSIA").  (ECF No. 30-1, at 28).  They cite to 28 U.S.C. § 1606, which states that "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages."  Plaintiffs state that a foreign state's armed forces constitute political subdivisions of the foreign state, not agencies or instrumentalities.  (*Id.* at 29).  Alternatively, Plaintiffs argue that EVL may not recover punitive damages for the types of counterclaims asserted, namely breach of contract.  (*Id.* ("In the absence of an underlying tort claim, EVL cannot possibly recover punitive damages.")).  In response, EVL argues that FSIA is inapplicable because the statute only applies where the district court's jurisdiction is premised on the FSIA and not where, as here, subject matter jurisdiction is based on diversity.  (ECF No. 35-1, at 30).  Although acknowledging the general rule in Maryland that punitive damages may not be recoverable for breach of contract actions, Defendant maintains that it may seek punitive damages here under the principle that such damages are available for

torts arising out of a contractual relationship. (*Id.* at 31-32).

Because punitive damages are not recoverable for breach of contract claims, the court need not determine the applicability of FSIA. *See, e.g., Wiggins v. North American Equitable Life Assur. Co.*, 644 F.2d 1014, 1017 (4th Cir. 1981) (recognizing that punitive damages may never be recovered in pure breach of contract suits). "Punitive damages, while not recoverable in a pure breach of contract action, may be recovered for a tort committed in connection with a breach of contract. [] Where recovery of punitive damages is based on a tort arising out of a contractual relationship, however, the plaintiff must prove actual malice." *Nunes v. Merrill Lunch, Pierce, Fenner & Smith, Inc.*, 609 F.Supp. 1055, 1061 (D.Md. 1985). Nowhere in the counterclaims does EVL assert a tort claim in connection with a breach of contract against Plaintiffs, however. Defendant acknowledges as much:

> EVL[] agrees that it may be necessary to amend its Counter Complaint and that it has the burden of establishing [] actual malice. . . . At this stage of the proceedings there exist facts, which taken in the light most favorable to the Defendant and Counterplaintiff *that there was an intentional interference with his contractual rights* when he refused to participate[] in the solicitations by Greek officials to pay them money, which would amount to bribery.

(ECF No. 35-1, at 32) (emphasis added).  As an initial matter, under the circumstances, Defendant may not amend the complaint to add a claim for tortious interference with contract at this stage of the proceedings, when the deadlines for amendment of pleadings has long passed and the case is ready to proceed to trial.  Moreover, it does not appear that a claim for tortious interference with contract can be made against Plaintiffs considering that they are parties to Contract No. 100/09.  *See, e.g., Dunnaville v. McCormick & Co., Inc.*, 21 F.Supp.2d 527, 536 (D.Md. 1998) ("Maryland courts have never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." (*quoting Bleich v. Florence Crittenton Servs.*, 98 Md.App. 123 (1993)); *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 297 (1994) (noting that tortious interference with an economic relationship "is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship.").  Accordingly, Defendant may not recover punitive damages from Plaintiffs.

## B.   Defendant's Cross Motion for Partial Summary Judgment

Defendant also moves for partial summary judgment, although the basis for the motion is unclear.  (*See* ECF No. 35-1, at 32-

33).  First,  Defendant  seemingly  wants  the  court  to  rule  that

Contract  No.  47/10  cannot  be  a  binding  contract  as  a  matter  of

law.  Defendant  states  that  "[w]hile  *the  ruling  on  this  issue  is*

*negligible  to  the  ultimate  findings*,  []  it  nevertheless  is

important  in  that  [Plaintiffs]  claim  [their]  contractual  terms

eliminate  its  exposure  to  the  storage  [charges]  of  EVL."  (*Id.*)

(emphasis  added).   As   explained   above,   there   is   some

inconsistency  on  the  record  as  to  whether  Contract  No.  47/10

ever  became  a  binding  contract  or  whether  the  parties  continued

to  operate  under  the  terms  of  Contract  No.  100/09  from  December

1,  2009  until  February  24,  2010.

Second,  Defendant  argues  that  Plaintiffs  are  not  entitled

to  set  off  the  amounts  of  previous  alleged  overpayments  against

amounts  that  Plaintiffs  owe  on  separate  invoices.   The  issue  of

Plaintiffs'  liability  as  to  breach  of  contract  (and  payment  of

invoices)  has  not  been  finally  resolved.   Indeed,  Defendant  did

not  move  for  summary  judgment  on  its  breach  of  contract  claim

against  Plaintiffs.   Accordingly,  it  is  premature  at  this

juncture  to  determine  whether  Plaintiffs  are  entitled  to  a

setoff  or  reduction  in  damages  before  determining  whether

Defendant  is  even  entitled  to  damages  and  on  what  basis.

**IV.  Conclusion**

For  the  foregoing  reasons,  Plaintiffs'  motion  for  partial

summary  judgment  will  be  granted  in  part.   Defendant's  cross

motion for partial summary judgment will be denied.   A separate

order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge