IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

THE HELLENIC MINISTRY OF NATIONAL
    DEFENSE, et al.                    :

    v.                                 :    Civil Action No. DKC 13-0828

                                       :

EAGLE VAN LINES, INC.

                                       :

**MEMORANDUM OPINION**

In order to resolve this five year dispute between units of

the Greek government and a Maryland-based freight forwarding

company concerning the shipment of military equipment, a bench

trial was held from April 16 to April 24, 2015.   Upon

consideration of the evidence adduced at trial, and the parties'

arguments with respect thereto, the court now issues findings of

fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52(a).[1]

---

[1] Rule 52(a) provides, in relevant part, that "[i]n an
action tried on the facts without a jury . . . , the court must
find the facts specially and state its conclusions of law
separately.   The findings and conclusions . . . may appear in an
opinion or a memorandum of decision filed by the court."   To
comply with this rule, the court "need only make brief,
definite, pertinent findings and conclusions upon the contested
matters, as there is no need for over-elaboration of detail or
particularization of facts."   *Wooten v. Lightburn*, 579 F.Supp.2d
769, 772 (W.D.Va. 2008) (*citing* Notes of Advisory Committee on
1946 Amendments).   As stated by Judge Nickerson in *Sherwin-
Williams Co. v. Coach Works Auto Collision Repair Center Inc.*,
Civ. Action No. WMN-07-2918, 2012 WL 2343235, at *5 (D.Md. June
19, 2012): "Rule 52(a) 'does not require the court to make
findings on all facts presented or to make detailed evidentiary

## I.   Background

Plaintiffs and Counter-Defendants the Hellenic Ministry of National Defense, the Hellenic Armed Forces, and the Hellenic Air Force Procurement Service (collectively, "HAF" or "Plaintiffs") are military units within the Greek government. Plaintiffs brought this action against freight forwarder Eagle Van Lines ("EVL" or "Defendant") on March 18, 2013, seeking the release of items belonging to HAF held in EVL facilities and damages for their alleged unlawful retention.  On June 14, 2013, Plaintiffs filed a first amended complaint asserting the following causes of action: (1) conversion (count I); and (2) breach of contract (count II).  Plaintiffs sought declaratory judgment and injunctive relief, which they designated as counts III and IV of the amended complaint.  (ECF No. 3).  The court granted Plaintiffs leave to file a second amended complaint, which contained an additional count for replevin and/or detinue, but otherwise remained identical to the prior complaints.  (ECF No. 57, second amended complaint).

Defendant counterclaimed against Plaintiffs for breach of contract (ECF No. 8).  Defendant requested declaratory judgment

---

findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient.' *Darter v. Greenville Comm. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (*quoting Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952))."

and punitive damages, which relief it included as separate causes of action. (ECF No. 8, at 5-6).

The parties' contractual relationship began in 2005 when EVL first became the freight forwarder for Plaintiffs. As relevant to the current dispute, the parties entered into Contract No. 100/09, which covered EVL's provision of freight-forwarding services from March 1, 2009 through November 30, 2009. Plaintiffs were not able to enter into another contract with a freight forwarder for the period beginning December 1, 2009 because of a bidding dispute, so, in early January 2010, the parties discussed the terms of an interim contract – draft No. 47/10 - designed to cover the time between the expiration of the earlier contract and the resolution of the bid dispute.

On February 12, 2010, the Minister of National Defense issued a decision discontinuing EVL's services as a freight-forwarder. HAF's materials continued to be shipped to EVL after the termination of its freight-forwarding services.

## II. Findings of Fact and Conclusions of Law[2]

Following the court's ruling on post-discovery cross-motions for partial summary judgment (ECF Nos. 40 & 41), the materials received by EVL up to February 24, 2010 were released

---

[2] The designation "PTX" refers to exhibits offered by Plaintiffs; and "DTX" refers to exhibits offered by Defendant EVL. References to trial testimony are designated by "T." followed by the date of the testimony.

to HAF on April 6, 2015.[3]   (DTX 4).   The following issues remained for trial: (1) as to Plaintiffs' complaint, whether Defendant is liable for conversion for accepting and retaining goods received after February 24, 2010 and, if so, the appropriate award of damages; and (2) as to Defendant's counterclaim for breach of contract, whether Plaintiffs are liable and if so, the appropriate damage award.   Plaintiffs seek the return of all materials belonging to HAF remaining in EVL's warehouse and compensatory damages for their unlawful retention in the form of damages for lost materials, lost technical documentation, expired materials, cost of human working hours to move spare parts, depreciation, and punitive damages.   Defendant seeks payment of seventy-eight (78) outstanding invoices and pre-judgment interest.[4]

**A.   Plaintiffs' Complaint**

**1.   Conversion**

As explained in the prior opinion, in Maryland the common law tort of conversion contains two elements.

---

[3] Defendant's Exhibit 4 is a list of inventory picked up on April 6, 2015, and reflects that over 800 items were released to HAF.  (DTX 4).

[4] Although much of the dispute between the parties concerned EVL's repeated requests for storage fees, during closing argument defense counsel indicated that EVL does *not* seek reimbursement for any charges incurred by EVL for goods received after February 24, 2010 or for storage fees.

> First, the plaintiff must prove the defendant exerted "any distinct ownership or dominion . . . over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 260 (2004) (quotation omitted). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* Second, the defendant must have "an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 836.

*Sprint Nextel Corp. v. Simple Cell, Inc.*, Civ. No. CCB-13-617, 2013 WL 3776933, at *8 (D.Md. July 17, 2013). "The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Darcars*, 379 Md. at 262. Conversion may occur in a variety of circumstances. A consignee who fails to return or pay for consigned goods may be held liable for conversion. *See, e.g., Bacon & Assocs., Inc. v. Rolly Tasker Sails (Thailand) Co.*, 154 Md.App. 617, 632 (2004).

All of the materials that EVL received before February 24, 2010 have been released, thus the only remaining question is whether EVL converted the items received after February 24, 2010. EVL previously relied on the existence of a warehouseman's statutory lien as a justification for conditioning the release of materials received after February

24, 2010 on payment of outstanding invoices by HAF. As explained in the memorandum opinion adjudicating the cross-motions for partial summary judgment, in Maryland, a warehouseman's statutory lien is conferred by Md. Code Ann., Com. Law § 7-209. Section 7-209(a) states, in relevant part:

> A warehouse has a lien against the bailor *on the goods covered by a warehouse receipt or storage agreement* or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

(emphasis added). Thus, the existence of a warehouseman's lien hinges on whether EVL issued warehouse receipts for the items it retained after February 24, 2010 because no storage agreement existed between the parties at any time. At trial, Defendant did not produce any warehouseman's receipts and essentially abandoned its warehouseman's lien defense. EVL also stipulated that it did not submit any invoices for items received after February 24, 2010. (ECF No. 52, at 12, amended joint pretrial order).

EVL also stated that it continued to receive goods because it was listed as a freight-forwarder for HAF on the Military Assistance Program Address Directory ("MAPAD"). EVL was *removed* from MAPAD as a freight forwarder by March 15, 2010, however.

(*See* PTX 82).   Goods continued to be misdirected to EVL for some time after that period, (T. Georgakopoulos, 04/22/15),[5] but even if EVL believed it had to accept shipments, it did not have any legal justification for retaining the goods for nearly five years.   George Georgakopoulos testified that EVL housed three *classified* items in its warehouse that it was not authorized to ship to Stellar Maritime, the freight-forwarding company to which HAF requested that EVL forward materials.   (T. 04/20/15). HAF requested that all *unclassified* materials be forwarded to Stellar Maritime, however.   (PTX 24, HAF 000524).    Mr. Georgakopoulos acknowledged that only three out of the approximately 2,000 items were classified.

Based on the foregoing, EVL has committed the tort of conversion.

###   2.   Detinue

Pursuant to Md. Rule 12-601(h), "[a]fter the issue of the right to possession before judgment is determined, the action shall proceed as an action for recovery of property after judgment under Rule 12-602."   *See Wallander v. Barnes*, 341 Md. 553, 572 (1996) ("Modern replevin in Maryland is a pre-judgment, but post-probable cause determination, seizure.").   Rule 12-602, entitled "Recovery of Property or Value after Judgment –

---

[5] Neither party has produced specific evidence of when EVL stopped receiving materials on behalf of HAF.

Detinue," provides, in turn, that "[a] judgment for the plaintiff shall award possession of the property or, in the alternative, payment of its value."   Md. Rule 12-602(d)(1). Such judgment must "separately set forth the value of the property and any amount awarded for damage to or detention of the property."  *Id.*  Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 11-104(a), "[i]n an action of detinue a plaintiff may recover the personal property and damages for the wrongful detention of the property."

It is uncontested that HAF has a right to possession of the withheld materials that were received by EVL after February 24, 2010 and for the reasons explained, EVL has offered no legal justification for conditioning their release.   Accordingly, EVL will be ordered to release to HAF the items received by EVL after February 24, 2010.

**3.   Damages**

A court sitting in diversity must apply state law governing the threshold of proof necessary for a damages award and the amount of that award.  *See Defender Indus., Inc. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502, 504-05 (4th Cir. 1991) (en banc). "The measure of damages for the conversion of a chattel is the market value of the chattel at the time and place of conversion plus interest to the date of judgment."  *Staub v. Staub*, 37 Md.App. 141, 145 (1977).   Here, the actual items have been or

8

will be returned to Plaintiffs.  There is no evidence that, for most of the items, their market value was diminished due to the detention.  Nor have Plaintiffs provided any evidence of the monetary value of any particular item or sought interest.  The exception is the expired items which lost their entire value due to the detention.  EVL has not contested that assessment and $67,768.59 will be awarded as damages to Plaintiffs for the expired items.

Plaintiffs do seek additional damages, however.  "As in other tort actions, additional damages adequate to compensate an owner for other injurious consequences which result in a loss greater than the diminished or market value of the chattel at the time of the trespass or conversion may be allowed *unless such claimed damages are so speculative as to create a danger of injustice to the opposite party*."  *Id.* at 145-46 (emphasis added); *United States v. Arora*, 860 F.Supp. 1091, 1100 (D.Md. 1994) (acknowledging the caveat from *Staub* that compensatory damages may not be so speculative as to create a danger of injustice).  Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 11-104(a), "[i]n an action of detinue a plaintiff may recover the personal property and damages for the wrongful detention of the property."  To be recoverable, damages must be "reasonably certain" and not "based on speculative, remote, or uncertain" figures.  *Dierker v. Eagle Nat. Bank*, 888 F.Supp.2d 645, 658

(D.Md. 2012); *Hoang v. Hewitt Ave Assocs., LLC*, 177 Md.App. 562 (2007).  Under Maryland law, "[i]f the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference." *David Sloane, Inc. v. Stanley G. House & Assocs. Inc.*, 311 Md. 36, 41 (Md. 1987) (internal quotation marks omitted).

  **a.   July 2014 Damage Report**

  Captain Konstantinos Katirtzidis provided testimony regarding Plaintiffs' damages and prepared a damage report. Captain Katirtzidis joined the military in 2000 as a military student, obtaining a bachelor's degree in 2004.  (T. 04/16/15). He studied economic theory and policy during his undergraduate studies.  He then obtained a master's degree in Philosophy of Economics.  (T. 04/16/15 & 04/17/15).  He began a PhD program in May 2007 and finished his dissertation on macroeconomics and economic policy in December 2012.  (T. 04/17/15).  From 2006 until 2009, he served in the procurement agency with the Hellenic Air Force where he was involved with procurement bids, appropriation, and negotiations.  In November 2009, he was promoted to be a member of the Directorate of Finance for Economics within the General Staff, where he issued directives to units of the Hellenic Air Force concerning procurement issues.  He remained there for five years, after which point he

was transferred to serve as a supervisor in an accounting department.  (T. 04/16/15).

As will be explained in more detail below, in preparing his damage report, Captain Katirtzidis obtained data from the appropriate units within the Hellenic Armed Forces.  He prepared a damage report in January 2014 with appendices quantifying each damage category sought by Plaintiffs.  After the January 2014 damage report, Captain Katirtzidis ordered another review by the logistics department to verify damages for lost items, which resulted in the amended July 2014 damage report.  The July 2014 damage report removes from the damage calculation some of the compensation originally sought in the January report.  (PTX 104).  Captain Katirtzidis did not personally review all of the primary information supporting the damages calculations; rather, he compiled the data provided to him by other offices and in some instances, reviewed representative samples of the primary documentation.  At least some primary documents were included in two envelopes (one envelope with supporting documentation regarding depreciation that accompanied the January 2014 damage report, and another envelope supporting damages for lost items that accompanied the June 2014 damage report), but these envelopes were not provided to defense counsel during discovery.  Captain Katirtzidis stated that his final damage report was submitted to the appropriate branches of the Hellenic Armed

Forces for approval, and was approved by his command. (T. 04/20/15).

Plaintiffs' counsel attempted to qualify Mr. Katirtzidis as a "damages" expert. However, as the court explained to counsel throughout trial, Captain Katirtzidis is a fact and summary witness, much like Stephanie Bo and Ngai Siu who testified on behalf of the defense. Captain Katirtzidis's "expertise" is only in compiling economic information or data and presenting it in a way that quantifies damages. He certainly is not an independent witness, given his position within HAF and the fact that his "expert report" had to be approved by his command.

This limited view of his purported expertise is exemplified by a recent opinion issued by the United States Court of Appeals for the Fourth Circuit:

> Rule 702 of the Federal Rules of Evidence permits expert witnesses to testify if their "scientific, technical, or other special knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," such as the amount of damages due. Fed.R.Evid. 702. The question of whether a witness is qualified to testify is context-driven and "can only be determined by the nature of the opinion he offers." *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984). Because our general preference is to admit evidence that will aid the trier of fact, the expert need only have "sufficient specialized knowledge to assist jurors in deciding the particular issues in the case." *Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146, 162 (4th Cir. 2012) (internal quotation

marks omitted); *see Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) ("Rule 702 was intended to liberalize the introduction of relevant expert evidence."); *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("Generally, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is offered."). In order to offer an opinion, "one . . . need not be precisely informed about all details of the issues raised" or even have prior experience with the particular subject the testimony concerns. *Lorillard*, 878 F.3d at 799; *see* Fed.R.Evid. 703 (providing that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of [at trial] or personally observed.").

In this case, Appellant "reads this [qualification] requirement far too narrowly." *Belk*, 679 F.3d at 162. Although Cohen had no prior experience with maritime contracts, his opinion did not call for such expertise. *Rather, his function was to calculate Appellee's damages.* Cohen has an MBA in economics. *He created mathematical formulas for this case after reviewing information that he obtained before trial by personally interviewing Appellee's employees and reading their deposition testimony.* Cohen then formed his opinion on the extent of Appellee's losses by applying his formulas.

. . . Although Cohen relied on information provided by other witnesses at trial to devise his formula, the Federal Rules of Evidence specifically authorized him to do so. *See* Fed.R.Evid. 703. . . . Thus, we conclude that the district court did not abuse its discretion *by permitting Cohen to offer expert testimony as to his calculation*

13

> *of Appellee's damages for demurrage and changes in commercial terms.*

*RG Steel Sparrows Point, LLC, f/k/a Severstal Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc., d/b/a Kinder Morgan Chesapeake Bulk Stevedores,* ---F.App'x----, 2015 WL 1905884, at *6 (4th Cir. Apr. 28, 2015) (unpublished opinion) (emphases added).

To the extent that calculation of damages is useful, the July 2014 damage report will be considered. The basis for any calculation is another matter. The witness accumulated financial and logistic information provided to him by other departments and synthesized it for the court in the appendices to the July 2014 damage report.[6] To that extent, his efforts were anything but independent and, to be credited, would have to be supported by other evidence.

**b.  Lost Items**

Plaintiffs seek $2,370,653.39 as compensation for items that they believe EVL lost and an additional $4,447 in damages for "lost technical documentation." (PTX 104, Tables 3 & 7 to Appendix A to the July 2014 damage report).

---

[6] As Captain Katirtzidis himself acknowledged at trial, he is not a logistics expert and is not an expert in reading the database which contained some of the information he used as a basis for computing damages. (T. 04/17/15 regarding PTX 106, two-page printout from SAMIS database).

Colonel Konstantinos Vlassis[7] provided testimony regarding how the underlying information that formed the basis of Colonel Katirtzidis's damage report – including damages for lost items – was obtained and verified.   Colonel Vlassis testified that on March 20, 2010, Nikolaos Klothakis, an Air Force officer resident at EVL's warehouse who served as a liaison between the Hellenic Armed Forces and EVL,[8] sent via email to the Hellenic Air Force a list of items purportedly held by EVL.   (T. 04/20/15; PTX 43).   The cover letter of this email is written in

---

[7] Colonel Vlassis first joined the Hellenic Air Force in 1981 as an officer in Andravida Air Base, providing supply support for aircraft, where he remained until approximately 1989.   After a series of logistics-related assignments in Greece and abroad in Paris, Colonel Vlassis returned to Greece in 2006, where he was assigned to be chief of a unit of the Air Force General Staff, supervising supply support of ammunition and fuel of the Hellenic Air Force.   In 2009, Colonel Vlassis became commander of a supply squadron, 112 combat wing.   (T. 04/20/15). In 2012, Colonel Vlassis became the Director of Logistics in the Hellenic Air Force General Staff, tasked with providing personnel and weapon systems to the Hellenic Air Force as needed.   (*Id.*).   When asked about the operations of the logistics directorate, Colonel Vlassis stated that D7 is supply depot, which is a central unit of supply support of the Air Force.   This unit provides spare parts, fuel, ammunition, and the like to the Hellenic Air Force.   Colonel Vlassis considers himself a logistician, particularly concerning supply support, technical support, and in providing necessities for weapon systems.

[8] George Georgakopoulos, President of EVL, testified that Contract No. 100/09 required that a liaison remain in EVL's office.   According to Mr. Georgakopoulos, Mr. Klothakis approved any hazmat or oversized material and submitted paperwork to the Greek embassy regarding payment of invoices.   (T. 04/21/15).   He further stated that the liaison was required to oversee the entire contract on behalf of the Hellenic Air Force.

Greek and Plaintiffs have not translated the email.[9]   Colonel
Vlassis testified that the email from Mr. Klothakis with an
attached list showing 1,642 items purportedly housed in EVL's
facilities, (PTX 43, HAF 000271-000301), responded to an order
from the Hellenic General Staff that he send this report.   (T.
04/20/15).   Colonel Vlassis stated that supply depot maintains
its own database comprised of information obtained from: Foreign
Military Sales ("FMS") information systems; Security Assistance
Management Manual ("SAMM"); Air Force Security Assistance Center
("AFSAC"); and information from invoices or packing lists from
vendors.   (*Id.*).   He stated that the list provided in the email
from Mr. Klothakis was cross checked with supply depot's
database in 2010 and that the supply depot database subsequently
was *updated* after the cross check to include information from
the list provided by Mr. Klothakis.

Three additional exhibits purport to show materials that
Plaintiffs at some point believed were retained by EVL:
Plaintiffs' Exhibits 90 and 105 and Defendant's Exhibit 2.
Defendant's Exhibit 2 and Plaintiffs' Exhibit 105 appear to be
identical.   Colonel Vlassis testified that Defendant's Exhibit 2
is a better-formatted version of Plaintiffs' Exhibit 90.   (T.

---

[9] Although Colonel Vlassis testified that the email was sent
on March 20, 2010, Plaintiffs' counsel represented during
closing argument that the court can take judicial notice based
on a line in the email that the email from Mr. Klothakis
actually was sent in May 2010.

04/20/15).   All  three  exhibits  appear  to  reflect  the  same

information.   Colonel Vlassis stated that Plaintiffs' Exhibit 90

is an earlier version of supply depot's database reflecting what

supply  depot  understood  EVL  was  holding  in  2012  and  2013.

Colonel  Vlassis  testified  that  Plaintiffs'  Exhibit  90  (which

mirrors   the   information   in   Plaintiffs'   Exhibit   105   and

Defendant's  Exhibit  2)  reflects  information  that  supply  depot

received from FMS, invoices of vendors, *and* information provided

by Mr. Klothakis in May 2010.  (*Id.*).

Then,  from  October  15  through  October  18,  2013,  Colonel

Vlassis led a Committee comprised of two other individuals (Wing

Commander   Konstantinos   Papathanasiou   and   Flight   Lieutenant

Leonidas Kantzidis),[10] in conducting an inventory or inspection

of HAF materials in EVL's warehouse in Temple Hills, Maryland.

(T. 04/20/15).   Following the inventory, he prepared a report.

(PTX 96).   Importantly, the report states, *inter alia*:

> (3) The inventory process was agreed upon by
> the attorneys Mr. Max Maccoby (of the law
> firm "Butzel Long, PC" who represents the
> Hellenic Republic) and Mr. George Petros,
> and was conducted as follows:
>
> (a)  *EVL  company  forwarded  initially  –*
> *through e-mail – the Committee and the law*
> *firm "Butzel Long, PC" the total list of the*
> *retained materials which – according to the*
> *opposing  party  –  were  stored  in  this*
> *specific place.*

---

[10] Colonel Katirtzidis stated that he was present during the
inventory in October 2013 as well.  (T. 04/17/15).

> (b) The total list of the materials – all
> documents (electronic and printed) were
> inspected and identified on the evidence of
> identification (STNR or P/N) or the document
> number (DCN) that were found on the
> accompanying documents on the boxes, in
> comparison each time as regard the rest of
> the quantitative data (quantity,
> description) *with the ones on the list which
> was given to the Committee by the opposing
> party on Tuesday, October 15, 2013, before
> the inspection.*

(PTX 96, HAF 001453) (emphases added).[11]

The report prepared by the Committee after the October 2013 inventory, (PTX 96), includes appendices, which reflect, *inter alia*: (1) 1,815 items that were found during the inventory (Appendix A); (2) 52 items that were found that have expired (Appendix B); (3) "the materials that were included on the first list given by [EVL] to the Committee for the inventory, but they were never found" (Appendix C); (4) "the bibliography requisitions [technical documentation] that were on the first list given by [EVL] to the Committee for the inventory, but they were never found" (Appendix D); (5) "the materials that *were found* during the inventory but they were not on the first list given by the company to the Committee for the inventory" (Appendix E).   (*See* PTX 96, HAF 001455 & accompanying appendices).

---

[11] Many of the exhibits provided by Plaintiffs at trial were translated from Greek.

Plaintiffs did not clarify at trial whether the reference to the "first list" provided by EVL in the Committee report refers to the email list sent *prior* to the inventory in October 2013 or the list provided by EVL on October 15, 2013, the first day of the inventory conducted by HAF. What is evident from Colonel Vlassis's testimony is that in conducting the inventory in October 2013, HAF relied on some list provided by EVL purporting to show what was stored in EVL's warehouse. Testimony from Stephanie Bo, previously employed with EVL from November 2010 until July 2014,[12] provides additional context. Ms. Bo became involved in the instant dispute sometime in February 2013, when she conducted a complete inventory of all foreign military goods belonging to HAF that were housed with EVL. (T. 04/23/15). Ms. Bo testified that sometime in February 2013, she examined EVL's inventory box-by-box, piece-by-piece, and recorded all of the details she could find on the documentation regarding the materials on hand. Where the boxes contained missing information about an item, Ms. Bo consulted EVL's records.[13] Ms. Bo also testified that she was provided a

---

[12] Ms. Bo worked as an international coordinator with EVL until the beginning of 2011, assisting with foreign military sales ("FMS") transactions involving inventory and import of such items. (T. 04/23/15).

[13] Ms. Bo testified that the "records" she consulted essentially were EVL spreadsheets; she did not know who created

list from HAF – Plaintiffs' Exhibit 105 – which she compared against what she actually found in EVL's warehouse when she conducted the physical inventory in February 2013. Ms. Bo stated that she provided her February 2013 inventory to Plaintiffs, which is the list they used during the October 2013 inventory. (T. 04/23/15). After HAF's inventory in October 2013, Ms. Bo created Defendant's Exhibit 3 sometime in October or November 2013, which she testified reflects a combination of what HAF provided in Plaintiffs' Exhibit 105 and what they actually found in October 2013. (T. 04/23/15; DTX 3).

On HAF's end, after the October 2013 inspection, Colonel Vlassis sent the Committee's inventory report with the appendices, (PTX 96), to the General Staff and supply depot of each branch of the Hellenic Armed Forces for cross checking. (T. 04/20/15). Colonel Vlassis stated that he supervised the cross-checking process and that the supply depot database was used for this purpose. (T. 04/20/15). Captain Katirtzidis also testified that he ordered supply depot to conduct the cross checking procedure between their database and the inventory report prepared by the Committee after the October 2013 inventory. (T. 04/17/15 & 04/20/15). In order to assure himself of the credibility of the underlying data regarding lost

---

the spreadsheets or when, and how they were maintained. (T. 04/23/15).

items, Captain Katirtzidis reviewed representative samples of the primary documents provided by teams from the Logistics Directorate.  (*Id.*).  He stated that the cross-checking procedure was conducted in two phases.  First, the logistics directorate cross checked the inventory report with the supply depot database and then Captain Katirtzidis prepared the first damage report in January 2014.  (*See* PTX 104, HAF 001534-001539).  In the January 2014 damage report, Plaintiffs requested $7,406,601.59 in damages for lost items.  Captain Katirtzidis believed that the first cross checking procedure may have resulted in some duplicate entries and excessive lost items, thus he ordered the teams to conduct a second cross-checking procedure to collect updated data and compose a second version of the damage report.  (T. 04/20/15).  The second cross-checking process was completed in June 2014, and resulted in the amended July 2014 damage report, in which the lost items damage figure was reduced to $2,370,653.39.  (*Id.*).

As is readily apparent from this recitation, the reliability and accuracy of any information maintained by the Hellenic Armed Forces regarding what materials were purchased, if such materials were sent to EVL, if EVL received them, and when, is impossible to ascertain with any degree of certainty. Plaintiffs have not offered any evidence as to any reliable and complete starting point that shows all materials purchased by

the Hellenic Armed Forces (encompassing the Navy, Army, and Air Force), when such materials were purchased, when they were sent to EVL, and when EVL purportedly received them.  Indeed, during closing argument, Plaintiffs' counsel was asked to identify where the record contains reliable evidence of what was received by EVL and when.  Plaintiffs' counsel indicated that he would address this point later in his argument, but he never did, leading to the conclusion that no such evidence exists or at the very least that no such evidence was presented at trial.  The picture of the bureaucratic morass within HAF portrayed at trial supports the conclusion that no such reliable evidence exists.

Colonel Vlassis testified that the logistics team used the appendices from the October 2013 inventory report and cross checked them with requisitions for purchased items which were in the supply depot's database to identify whether anything was "lost" by EVL.  (T. 04/20/15).  He stated that the requisition information was obtained from FMS information system and from vendors.  When Plaintiffs conducted the inventory in October 2013, however, they relied on a list provided *by EVL*, and not on their own complete list reflecting what materials they thought should have been in EVL's warehouse.  A notation to Table 3 to Appendix A of the July 2014 damage report indicates that "[t]he additional non-identified materials during inventory inspection, dated Oct[ober] 2013, *based on the inventory list given to the*

22

*HAF Committee by the defendant*, are listed in the Appendix 'K.'" (PTX 104, HAF 002404 n.3 & Appendix K) (emphasis added). Among the items included in Appendix K – which is based on EVL's list and *not* on HAF's own records – is a $400,000 digital flight control computer, which Plaintiffs apparently never inquired about prior to receiving a list from EVL. Captain Katirtzidis stated that the items appearing in Appendix K which were not found during the inventory in October 2013 were sent to supply depot, which verified that the items were purchased. (T. 04/17/15). Plaintiffs have provided no proof, however, that the items actually were purchased by HAF and, more importantly, have not verified if and when such items were expected to be shipped to and/or received by EVL.

Moreover, according to Colonel Vlassis' testimony, the supply depot database was updated in 2010 to include information provided by Mr. Klothakis in May 2010 purporting to show items held by EVL. EVL disputes that the list provided by Mr. Klothakis to the Hellenic Air Force in May 2010 reflects the items held by EVL, however. Plaintiffs made no effort to translate from Greek to English the cover email by Mr. Klothakis sent with this list, nor was Mr. Klothakis called to testify. Furthermore, on cross-examination, Colonel Vlassis himself admitted that he did not know how or when Mr. Klothakis compiled the information on the list sent to the Air Force. (T.

04/20/15).   Colonel Vlassis further conceded that nothing in the email indicated that Mr. Klothakis asked EVL to prepare its own inventory list.   (*Id.*).   George Georgakopoulos, President of EVL, testified that Mr. Klothakis was not given access to any inventory list from EVL, and that Mr. Klothakis kept his own list.   (T. 04/21/15).   Plaintiffs have not persuaded the court that their Exhibit 43 – which purports to be a list from Mr. Klothakis with items held by EVL – accurately reflects HAF materials received by EVL.   This list does not even include a date on which the items either were sent to or received by EVL, which undermines the reliability of this document.   The fact that Mr. Klothakis sent an email purporting to show materials retained by EVL which cannot be verified taints the reliability of the supply depot database which then incorporated the data from Mr. Klothakis's list.

Colonel Vlassis testified that Plaintiffs' Exhibit 90 (which reflects the same information as Plaintiffs' Exhibit 105 and Defendant's Exhibit 2) is an early version of supply depot's database reflecting what supply depot understood EVL was holding in 2012 and 2013.   (T. 04/20/15).   Stephanie Bo's final report – Defendant's Exhibit 3 – specifically attempts to reconcile Plaintiffs' Exhibit 105 with what she found in EVL's warehouse when she conducted the physical inventory in February 2013.   In some instances, Ms. Bo actually found *more* items in EVL's

24

inventory than what was reflected on Plaintiffs' list. (*See, e.g.,* DTX 3, referencing HAF 001730 to 001732). Stephanie Bo also testified that at least one of the items that HAF asserted EVL lost is an inertial measuring unit that HAF valued at $170,000. (*See* PTX 104, Appendix G to July 2014 damage report, HAF 002496, $170,000 inertial measuring unit dated Oct. 21, 2008). According to HAF's records, this item was received by EVL on October 21, *2008*, predating Contract No. 100/09. Moreover, Stephanie Bo testified that although the specific inertial measuring unit that HAF believes EVL lost was not received by EVL, it received the same product throughout 2006, 2007, and 2008, and shipped the item. (T. 04/23/15; DTX 3, referencing HAF 001724). Stephanie Bo's notes also reflect that the repeated value of the same item was $45,000, not $170,000. Ms. Bo even tracked some items with UPS, but UPS had no record of the items having been received by EVL. (T. 04/23/15; DTX 3 (referencing thirteen items with UPS)). Plaintiffs question the reliability of EVL's records, but the burden is on *Plaintiffs* to prove damages with a reasonable certainty.

During closing argument, Plaintiffs' counsel indicated that HAF is not offering Exhibit 105 – which purports to be a snapshot of the information contained in the supply depot database – for any purpose other than briefly to describe a process that took place before the cross checking procedure.

The reliability of the cross checking procedure, however, hinges on the accuracy of the information contained in the supply depot database, the contents of which Plaintiffs have not produced to defense counsel *or* at trial.[14]   Only a limited sample of the underlying primary documents to support lost items damages were produced to defense counsel and at trial.[15]   (*See* PTX 106). During closing argument, Plaintiffs' counsel asked the court to credit the fact that the lost damages appendices to the July 2014 damage report resulted from two time-consuming cross-checking procedures implemented by HAF to ensure the credibility of the data.   Plaintiffs essentially ask the court to place

---

[14]   It is not even clear how many databases were cross checked: Captain Katirtzidis testified that the supply depot departments of each branch of the Hellenic Armed Forces were ordered to perform a cross check to identify missing items.

[15]   Moreover, closing argument revealed that Plaintiffs' Exhibit 105 – which Colonel Vlassis testified captures at least some of the information from the supply depot database from some point in 2012 or 2013 – only reflects information regarding materials of the Air Force, and *not* the Navy or Army.   Captain Katirtzidis created appendices to his July 2014 damage report showing lost items of the Air Force, *along with lost items of the Hellenic Army and Navy*, but the appendices are merely compilations of information he received *elsewhere*.   (*See* PTX 104, Appendices E through G & K to July 2014 damage report). Nothing on the record shows *where* Captain Katirtzidis obtained the underlying information regarding lost items of the Navy and Army (other than that he entrusted supply depot of each branch of the Hellenic Armed Forces to cross check their records and reviewed a representative sample of some documentation), and his attestations alone that he verified the credibility of the data he included in the appendices and that each branch of the Hellenic Armed Forces cross checked its own supply depot database are not persuasive.

great confidence in the cross checking efforts of the logistics teams within the Hellenic Armed Forces and the credibility of the inventory database(s) against which they conducted the cross checking. The court accepts that a second cross checking procedure was conducted and that HAF believes that the appendices to the July 2014 damage report reflect items that EVL lost.[16] The fact that a second cross checking procedure was implemented, however, does not persuade the court that EVL lost the items that Plaintiffs attribute to it as having received. Stephanie Bo provided credible testimony that when EVL records showed an item was received, it was found. (T. 04/23/15).

Also worth noting is the additional argument made by Plaintiffs' counsel regarding the $5 million difference in the lost materials damages calculation from the January to June 2014 damage report. The fact that a second cross checking procedure resulted in a considerably smaller damages calculation does

---

[16] Ironically, during closing argument, Plaintiffs' counsel took the position that an exhibit prepared by Ngai Siu, an accounting manager with EVL, (DTX 10), reflecting the payment difference between applying the pricing terms under Contract No. 47/10 as opposed to Contract No. 100/09 to the fifty one disputed invoices (discussed below) was unreliable because Plaintiffs have no way of knowing whether the figures applied by Ms. Siu are accurate. Plaintiffs' counsel characterized the evidence regarding the fifty-one (51) invoices as a "conclusory exhibit" because it contained only a summary of Ms. Siu's findings in terms of the amounts that would be owed under Contract No. 100/09 as compared to draft No. 47/10. The appendices to the July 2014 damage report which Plaintiffs offer as evidence to support lost damages are also *summary* exhibits.

27

nothing to increase the court's confidence in the information contained in the supply depot's database. Plaintiffs did not even provide evidence as to how the database was maintained or updated, how often, and by whom. Although Colonel Vlassis testified that the information in the database came from FMS records, commercial requests, and vendors, he also stated that the database incorporated information from Mr. Klothakis's email, the accuracy of which has not been established.

Plaintiffs also seek $4,447 in damages for "lost technical documentation." (PTX 104, Appendix L to July 2014 damage report). The July 2014 report states:

> (a) The technical documentation of Hellenic Armed Forces, *listed in EVL's inventory report* produced to HAF Committee during inspection, dated Oct[ober] 2013, which was not identified however by our personnel, is provided in Appendix "L" and costs 4,447.00$.

> (b) The documentation, which was identified during inspection and is expected to be released from EVL's facilities by the Judge's order is not included in Appendix "L."

(emphasis added). Most of the "technical documentation" identified in Appendix L reflects a twenty dollar cost. Captain Katirtzidis testified that he received data from the logistics branch which showed an average value of twenty dollars for technical manuals because the Hellenic Air Force regularly purchases technical documentation. Although the "technical

28

documentation" reflected in Appendix L predominantly reflects a cost of twenty dollars, it also identifies purportedly lost publications valued at a higher price. (*See, e.g.,* PTX 104, Appendix L to July 2014 damage report, HAF 002535, $85 publication). Captain Katirtzidis testified that the higher figures reflect specific costs of technical documentation from supply depot data for other versions of the same document.

Awarding damages for "lost technical documentation" presents the same problem discussed above regarding lost materials damages. Plaintiffs have not pointed to any reliable evidence showing that the specific technical documentation they claim EVL lost actually was purchased by Plaintiffs, the date of such purchase, that the specific lost technical documentation was sent to and received by EVL, and what materials the manuals pertain to. Appendix L to the July 2014 damage report does *not* even include a column for date of purchase or the date that HAF believes specific technical documentation was sent to or should have been received by EVL. Moreover, although Captain Katirtzidis generally averred that technical documentation cost twenty dollars on average, Plaintiffs have not provided any proof of the price paid for the specific technical manuals they believe were sent to EVL but now are missing. According to the report prepared by Colonel Vlassis following the October 2013 inventory, EVL "forwarded initially – through e-mail – to the

Committee and the law firm 'Butzel Long, PC' the total list of
the retained materials which – according to the opposing party –
were stored in this specific place." (PTX 96, HAF 001453).
The Committee also apparently received a list of items
purportedly held in EVL's warehouse on October 15, 2013, the
first day of the inspection. (*Id.*). In Appendix D to the post-
inventory report prepared by Colonel Vlassis, (PTX 96), HAF
identified "the bibliography requisitions," which is the
technical documentation Plaintiffs believe EVL lost, "that were
on the first list given by [EVL] to the Committee for the
inventory, but they were never found." (*Id.* HAF 001455; PTX 96,
HAF 001702-1707). No evidence has been presented as to the
reliability of this "first list" purportedly emailed by EVL to
HAF before the October 2013 inventory, when such list was
created, by whom, or how. Moreover, according to Colonel
Vlassis's report, some items that *were* found by HAF during the
October 2013 inventory were not identified on this first list,
further undermining the reliability of this list. (*See* PTX 96,
HAF 1455 ("5/in Appendix "E" the materials that were found
during the inventory but they were not on the first list given
by [EVL] to the Committee for the inventory.")). Without any
reliable evidence as a basis for concluding that EVL actually
received the technical documentation and when, any damage award

for "lost technical documentation" would be entirely speculative and, as such, will not be ordered.

Based on the foregoing, Plaintiffs have not convinced the court that they kept a complete and accurate record of when items were shipped to EVL (or should have been received by EVL), given that at least some of the items they now claim have been lost by EVL predate Contract No. 100/09 according to HAF's own records and Plaintiffs produced no evidence that they previously inquired about these items.  Accordingly, no damages for lost items will be awarded.

### c.  Expired Materials

According to the damage report prepared by Captain Katirtzidis, a subset of retained materials by EVL had a life limit and have since expired.  (PTX 104, Katirtzidis July 2014 damage report, HAF 002396; *see also* Table 4 to Appendix A in PTX 104).  The expired materials are contained in Appendices H through J to Captain Katirtzidis's July 2014 damage report in Plaintiffs' Exhibit 104.[17]  Plaintiffs seek a total of $67,768.59

---

[17]  Appendix H to the July 2014 damage report contains expired materials belonging to the Hellenic Army; Appendix I contains expired materials belonging to the Hellenic Navy; and Appendix J contains expired materials belonging to the Hellenic Air Force.  (PTX 104).

as damages for expired items for all three branches of the Hellenic Armed Forces.[18]

Captain Katirtzidis testified that when the Hellenic Armed Forces conducted an inventory in EVL's warehouse in October 2013, specific items were identified that had expired, such as oils for aircraft. (T. 4/17/15). He indicated that the packages contained in EVL's warehouse reflected a life expiration date and from that information, the Hellenic Armed Forces determined items that have become useless and can no longer be used operationally by HAF. Plaintiffs calculated the damages for expired items by reviewing the purchase price of the respective expired items. Defense counsel indicated during closing argument that EVL does not directly contest the claim for damages for expired goods. Accordingly, Plaintiffs will be awarded damages in the amount of $67,768.59 for the expired items.

### d. Depreciation

Plaintiffs seek $17,366,533.50 in depreciation damages caused by the alleged inactivity or grounding of Hellenic Armed Forces' aircraft and helicopters as a result of material retained by EVL. (PTX 104, Table 5 to July 2014 damage report,

---

[18] Although Plaintiffs initially sought to add a ten percent penalty to all of their damage figures pursuant to Contract No. 100/09, Plaintiffs' counsel indicated at trial that HAF is not seeking penalty damages.

HAF 002406).   The July 2014 damage report prepared by Captain Katirtzidis states that "[m]any aircraft[] and helicopters of the Hellenic Armed Forces have been grounded, i.e., remained in mission inactivity, due to the disruption the defendant generated to their regular logistics support."   (PTX 104, HAF 002396).   Plaintiffs argue that items or parts held by EVL contributed to grounding of one hundred (100) aircraft and six (6) helicopters.   (PTX 104, Table 5 to Appendix A & Appendices B & C to July 2014 damage report, HAF 001518-001525).

As intimated during trial, the attempt to quantify damages due to "depreciation" of aircraft and helicopters fails. Captain Katirtzidis testified that he calculated annual depreciation by dividing the purchase price of each aircraft and helicopter by its life span, which he stated is an internationally accepted methodology used to calculate depreciation.[19]   (T. 04/17/15).   On recall, he explained that the Aircrafts Engineering Directorate provided a formula to him to

---

[19] Captain Katirtzidis stated that although he calculated depreciation on an annual basis, the same methodology is applied to calculate quarterly or monthly depreciation.   (T. 04/17/15). He further stated that he did not personally review the purchase price of each aircraft and helicopter and similarly was not aware of their life spans, but received this information from other units within the Hellenic Armed Forces, such as the Directorate of Mechanics and Directorate of Economics.

calculate the life span of grounded aircraft and helicopters.[20]
He testified that the information he received from the Aircraft
Engineering Directorate indicated that the formula for life span
is a ratio of maximum operational hours of aircraft to the hours
each aircraft operates every year.   In other words, the
numerator is measured by maximum flying hours delineated by the
manufacturer, and the denominator is measured *by the actual
flying hours* of the aircraft by year.   (T. Katirtzidis,
04/20/15).

The methodology Plaintiffs utilized for determining
depreciation undermines their theory that the aircraft and
helicopters declined in value as a result of the withholding of
parts by EVL.   Captain Katirtzidis's depreciation model relies
on two variables: purchase price and life span.   The very
formula or premise underlying the calculation of an aircraft's
or helicopter's life span assumes the aircraft's *use*.   Here, the
aircraft and helicopters were not utilizing *any* flying hours
because, according to Plaintiffs, they were grounded.
Plaintiffs provided no evidence that any aircraft or helicopter
that was *not* flown because of a missing part diminished in

---

[20] Captain Katirtzidis stated that the life span formula was
contained in a report which HAF included in an envelope
attachment to the January 2014 damage report.   (T. 04/20/15; PTX
104, HAF 001538).   This report was not provided to Defendant
until trial.   (Court's Exh. 1).   The produced document is
primarily written in Greek, but Plaintiffs represent that the
report identifies the formula for calculating life span.

value, but the methodology for calculating life span *assumes* the use of operational hours.    Plaintiffs have not shown why operating the aircraft now, as opposed to sometime earlier, would decrease its value.    Plaintiffs did not produce a single witness or document to explain why the aircraft or helicopters would depreciate when *not* in use.    The argument made by Plaintiffs' counsel, Mr. Gordin, during a bench conference on April 20, 2015 and at closing argument that if an aircraft is grounded for a certain period of time there is no way to tell how it will operate in the future proves that awarding depreciation damages based on the evidence presented would be far too speculative.

Moreover, the argument that HAF had to use other aircraft for more hours than would otherwise be needed because some aircraft were unavailable is similarly illogical.    The operational hours will even out over time.    Now that all necessary spare parts will be released, HAF can use the formerly unavailable aircraft, and not those overused over the past five years, to perform necessary duties.    In short, Plaintiffs have not proven that the absence of spare parts resulted in any measurable depreciation damages.

One additional point is worth noting.    Appendix B reflects that for all but thirty-one (31) of the aircraft, Plaintiffs believe the grounding was due to additional missing parts and

not only those withheld by EVL. In other words, for only thirty-one (31) out of the one hundred (100) aircraft do Plaintiffs attribute grounding or inactivity *solely* due to EVL's withholding of necessary spare parts. (PTX 104, Appendix B to the July 2014 damage report, HAF 001518-001519). As the court pointed out during trial, the fact that all but thirty-one aircraft were grounded at least in part due to missing parts *not* attributed to EVL creates a causation problem because those sixty-nine aircraft would have *remained* grounded irrespective of whether EVL released the parts. During closing argument, Plaintiffs' counsel cited *Eagle-Picher Industries, Inc. v. Balbos*, 326 Md. 179 (1992), involving asbestos, on the issue of causation. Cases discussing causation in the asbestos context are inapplicable here. Even if they were, however, unlike in *Eagle-Pitcher*, Plaintiffs have offered no evidence that the withholding of spare parts by EVL was a substantial factor in their grounding.

### e. Cost of Human Working Hours

Plaintiffs seek $7,572.50 in damages consisting of "[c]ost of consumed human working hours of Hellenic Army personnel for restorations." (PTX 104, July 2014 damage report, HAF 002397). Captain Katirtzidis testified that this figure represents wages paid to personnel of the Hellenic Armed Forces to extract parts from some assets to other ones. According to Captain

36

Katirtzidis's testimony and Table 6 to Appendix A of the June 2014 damages report prepared by him, (PTX 104, HAF 002407), Army personnel expended approximately 218 hours in moving parts from certain assets to aircraft and/or helicopters.    (T. 4/17/15). Captain Katirtzidis testified that only the Hellenic Army – and not the Navy and Air Force – possessed documentation to substantiate cost of human working hours in moving parts from aircraft.    (*Id.*).    He stated that logistics staff verified the accuracy of the figures in terms of expended hours and cost. Defense counsel did not object to this damage award during closing argument.    The court credits Captain Katirtzidis's testimony and Table 6 to Appendix A of the June 2014 damage report, and will award Plaintiffs $7,572.50 in damages.

####    f.    Punitive Damages

Plaintiffs also seek punitive damages.    "[A] plaintiff has no right or entitlement to punitive damages under Maryland law." *Bowden v. Caldor, Inc.*, 350 Md. 4, 25 (1998).    In *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249 (2004),[21] the Court of Appeals of Maryland provided the following analysis regarding an award of punitive damages for conversion:

> In recent years, the law of punitive damages
> has undergone significant development.  *See,*

---

[21]    During closing argument, Plaintiffs' counsel cited the opinion from the Court of Special Appeals of Maryland, 150 Md.App. 18 (2003), but the analysis from the decision of the Court of Appeals controls.

> *e.g., Montgomery Ward [v. Wilson]*, 339 Md.
> [701], 241 [(1995)]; . . . The leading case
> in this effort is *Owens-Illinois v. Zenobia*,
> in which Judge Eldridge, writing for the
> Court, made it clear that a jury may award
> punitive damages only when a plaintiff has
> demonstrated by clear and convincing
> evidence that the defendant acted with
> "actual malice." 325 Md. [420,] 460 [1992].
>
> . . .
>
> Like in the context of products liability,
> fraud, and malicious prosecution, the
> availability of punitive damages for the
> tort of conversion depends on the intent of
> the tortfeasor. While a plaintiff may
> obtain a compensatory damage award by
> proving merely that the defendant, without
> bad faith, intended to exert unlawful
> dominion over the plaintiff's property,
> punitive damages may be awarded only if the
> defendant demonstrated "actual malice" in
> carrying out the conversion. The term
> "actual malice" in the context of conversion
> requires little explanation beyond the
> definition we have established in our
> previous cases: consciousness of the
> wrongdoing or "conduct of the defendant
> characterized by evil motive, intent to
> injure, ill will, or fraud." *Zenobia*, 325
> Md. at 460. . . . Where the defendant
> converts property with a consciousness of
> the wrongfulness of that conversion, he or
> she possesses the requisite improper motive
> to justify the imposition of punitive
> damages.

*Id.* at 264-266. "[T]he trier of fact has discretion to deny
punitive damages even where the record otherwise would support
their award." *Adams v. Coates*, 331 Md. 1, 15 (1993).

Plaintiffs have not proven by clear and convincing evidence
that EVL acted with actual malice. Plaintiffs argue that the

38

court should infer ill will by examining EVL's conduct and justifications for continuing to accept the materials and refusing to forward them, and by purportedly misleading the Armed Forces.

It is uncontested that EVL continued to receive shipments following the termination of its freight forwarding services. Mr. Georgakopoulos and Stephanie Bo both testified that HAF was responsible pursuant to the Security Assistance Management Manual ("SAMM") to change the MAPAD listing to reflect that EVL was no longer the freight forwarder for the Greek government. (T. 04/21/15 & 04/23/15). Chapter C7.7.3 of SAMM supports this point:

> Correct MAPAD addresses are essential for accurate routing of cargo and documentation and will also ensure the FMS purchasers are charged the correct transportation rate. . . . If there is a change in FMS freight forwarder, *the purchaser is responsible for adjusting its MAPAD listing* through the IA focal point and reconciling shipments received by its former FMS freight forwarder.

(PTX 118) (emphasis added). EVL was removed from MAPAD as a freight forwarder by March 15, 2010. (*See* PTX 82; T. Georgakopoulos 04/21/15). EVL continued to receive shipments after that date, however, and the reasons are not entirely clear. Mr. Georgakopoulos testified that the United States Army misdirected certain Greek military items to EVL sometime in

2011, and the dispute was resolved in 2012, with EVL shipping the items to Stellar Maritime and receiving payment which included a nominal figure for storage fees. (*See* DTX 26). Plaintiffs did not present any additional evidence identifying what other materials EVL received after the MAPAD listing was changed and why. Mr. Georgakopoulous testified that in connection with repaired items, EVL was listed as an importer, thus it had to be the exporter and had to accept those items. (T. 04/21/15). EVL provided no legal support or other evidence confirming this point, but the burden is on Plaintiffs to prove by clear and convincing evidence that EVL acted with actual malice.

Plaintiffs also rely on an email from Elizabeth Donato, the central case manager for Greek Army programs, to George Georgakopoulos, dated March 16, 2011, in which she requested that "EVL no longer accept GoG shipments that were inadvertently shipped in error to EVL." (PTX 76). Plaintiffs reference this correspondence as evidence that EVL should have refused further shipments after this point and failure to do so constitutes ill will. Plaintiffs have not even established, however, that EVL continued to receive and accept materials after the correspondence from Ms. Donato. Mr. Georgakopoulos testified that EVL received the majority of the items housed in its warehouse before April 17, 2010 and, as explained above,

Plaintiffs could not identify a reliable and complete source on the record indicating exactly what was received and when.   (T. 04/21/15).   In her deposition, excerpts of which Plaintiffs have designated for trial, Ms. Donato testified that she did not believe that she authored any similar correspondence or e-mail instruction directing EVL not to accept GoG shipments *before* her email of March 16, 2011.   (PTX 112, at 9).   Plaintiffs' counsel argued that as an experienced freight forwarder, EVL should have known not to accept the materials coming in after its freight forwarding services were terminated in February 2010 or should have contacted United States authorities to confirm its obligations concerning acceptance of misdirected items.   Mr. Georgakopoulos's testimony confirms that it was EVL's top priority to have the Hellenic Armed Forces pay outstanding invoices before materials were released because as he stated, EVL often had to wait considerable periods of time to receive payment for shipped items and oftentimes the invoices were not paid fully.   (*See* DTX 16).   Captain Nikomanis testified that after November 30, 2009 until July 2010, HAF made monthly payments to EVL.   (T. 04/17/15).   These payments were made for items that were delivered much earlier, however, and invoices remained outstanding.   (T. Georgakopoulos, 04/21/15).   As Mr. Georgakopoulos stated, the primary reason for continuing relations with the Greek government from EVL's perspective was

41

not for monetary purposes, but to gain leverage in attracting other business. (*Id.*). Undoubtedly, EVL should have been much more proactive in determining its obligations and it was exceedingly imprudent for EVL to condition the release of materials on payment of outstanding invoices and storage fees. Nor did EVL have a legal basis for refusing to release retained materials until HAF paid outstanding invoices, although EVL believed it could assert a statutory lien. Nevertheless, EVL's conduct does not rise to the level of evil motive, intent to injure, ill will, or fraud, to warrant punitive damages.[22]

Based on the foregoing, punitive damages will not be awarded.

**B.  Defendant's Counterclaim**

Defendant's breach of contract counterclaim is premised on Plaintiffs' refusal to pay four categories of invoices: (1)

---

[22] As further evidence of ill will, Plaintiffs rely on correspondence from the Hellenic Armed Forces informing EVL that the retention of materials was inhibiting Greece's operational readiness. (PTX 47 & 50). Even after the termination of its freight forwarding services, however, EVL continued to ship some items that were deemed crucial. (T. Georgakopoulos, 04/21/15). In any event, as defense counsel pointed out, Plaintiffs initiated this action in this court in March 2013, but did not move for a preliminary injunction or seek replevin to obtain immediate release of their materials.

invoices 1-51; (2) invoices 52-64; (3) invoices 65-67; and (4) invoices 68-78.[23]   Article 8.3 of Contract No. 100/09 states:

> The Military Attaches will repay the CONTRACTOR [EVL] in U.S. dollars for the services rendered by the contractor, *within two (2) months at the latest from the date they received the required supporting documents*, as the case may be, which the competent Services will receive in Greece, provided that a relevant inspection determines that they are appropriate.

(DTX 1) (emphasis added).   Captain Andreas Nikomanis provided testimony on behalf of HAF regarding payment of invoices. Captain Nikomanis worked in the 112th combat wing of the Hellenic Air Force from 2005 to 2008, and was transferred to the transportation division in 2008, where he was responsible for payments for transportation materials of the Hellenic Air Force. (T. 04/17/15).   He testified that his procedure for reviewing EVL's invoices involved determining whether the charges were consistent with Contract No. 100/09 and Greek legislation and whether all appropriate documentation was included to justify the respective charges.   (*Id.*).

### 1.   Invoices 1-51

Captain Nikomanis stated that after the expiration of Contract No. 100/09, he received instruction from the General

---

[23]   At summary judgment, Plaintiffs argued that Defendant is precluded from collecting payment on certain invoices because of the three-year statute of limitations.   During closing argument, Plaintiffs' counsel indicated that HAF no longer asserts the statute of limitations affirmative defense.

Staff that draft Contract No. 47/10 was commonly agreed to between EVL and the Air Force and that the respective invoices should be reviewed according to that contract.   Between May and July 2010, a time period post-dating the termination of EVL's freight-forwarding services, EVL submitted these fifty-one (51) invoices seeking payment for services performed between December 1, 2009 and February 24, 2010. (*See* DTX 10).   Captain Nikomanis stated that these fifty-one (51) invoices were properly documented under Contract No. 100/09 but were not paid by HAF solely because, according to HAF, they were improperly billed using the pricing terms of Contract No. 100/09 instead of Contract No. 47/10.   (T. 04/17/15).   Plaintiffs take the position that from December 1, 2009 until February 24, 2010, the parties were governed by Contract No. 47/10.[24]

It is undisputed that Contract No. 100/09 covered freight-forwarding services by EVL and payment from the Hellenic Armed Forces from March 1, 2009 until November 30, 2009.   (DTX 1). The only dispute concerns what terms governed the parties' relationship from December 1, 2009 until February 24, 2010, when EVL received official written notice from Mr. Klothakis that the Minister of Defense terminated its freight-forwarding services. (T. Georgakopoulos, 04/21/15).   Captain Katirtzidis testified

---

[24] The parties agree that whether Contract No. 100/09 or draft No. 47/10 applies is relevant only as to payment of these fifty-one (51) invoices.

that in 2009, three companies, Imperio-Argo Group, EVL, and Stellar Maritime, participated in a procurement bid for a freight forwarding contract after the expiration of Contract No. 100/09. (T. 04/16/15). On August 18, 2009, the Minister of Defense reached a decision to award the new freight forwarding contract to Imperio-Argo Group, and EVL formally protested that decision under Greek law. (*Id.*; T. Georgakopoulos 04/21/15). After November 30, 2009, the parties began discussing the terms of an interim contract – draft No. 47/10 – which would govern from December 1, 2009 until the resolution of EVL's protest of the new contract award to Imperio-Argo Group. The parties disagree on whether the terms of the negotiated contract ever became binding on the parties. Under draft No. 47/10, payment for EVL's services would be based on the destination of the materials and different rates would apply depending on the "zones" identified in draft No. 47/10. (PTX 18, draft 47/10, HAF 001345-001347). Specifically, pricing under draft No. 47/10 would be determined based on the weight of the item and the zone under which it falls depending on where it would be transported. (*Id.*). Under Contract No. 100/09, however, zone and item weight did not affect pricing.

Plaintiffs have not proven that the parties who participated in negotiations in January 2010 had the authority to bind either party to the terms of draft No. 47/10. During

45

direct examination, Mr. Georgakopoulos, who served as the President of EVL beginning in July 2009, was shown a Greek and English-translated version of Contract No. 47/10 from January 12, 2010 containing initials on every page; Mr. Georgakopoulos stated that the initials were *not* his and that EVL's attorney in Greece signed the document in January 2010 and faxed it to EVL. (T. 04/21/15; *see also* PTX 18, January 2010 draft of 47/10). Mr. Georgakopoulos testified that initialing documents is standard protocol used by foreign governments for submitting documents for purposes of negotiation or review. The Greek version of the January 2010 draft of 47/10 contains the words "Draft Only For Negotiations" on every page. (PTX 18). Mr. Georgakopoulos stated that he never received a copy of 47/10 without the words "draft only." He further testified that when a contract is finally agreed to by both parties, it bears the stamp of the Greek government and is signed and sealed, as reflected on the last page of the Greek version of Contract No. 100/09 which was formally executed. (*See* DTX 1). He stated that he never saw a copy of draft No. 47/10 that contained a signature and stamp of the Greek government. (T. 04/21/15).

Captain Katirtzidis provided similar testimony. He testified that he supervised the progress of negotiating the interim contract in January 2010, although he did not participate in the January negotiation. (T. 04/16/15). He also

stated that the January 2010 version of draft No. 47/10 was *not* signed formally, but was signed or initialed only within the context of negotiations, showing that two parties mutually agree to the draft contract during negotiations.  According to Captain Katirtzidis's testimony, however, in order for the Greek government to be bound by the terms of any contract, it must be approved by the Minister of Defense, after which candidates would be invited to sign the contract formally.  (*Id.*).  It was not until May 3, 2010, nearly three months *after* Greece terminated EVL's freight forwarding services, that the Minister of Defense sent a fax message to George Voultsis, EVL's attorney at the time, inviting EVL to sign draft No. 47/10.  (PTX 39).  What followed were a series of communications back and forth between HAF and EVL, with each side expressing its objection to varying demands by the other, and with HAF urging EVL formally to sign draft No. 47/10.  (*See* PTX 40, 42, 47, 48, 50, 52, 53, 54).  Representatives from EVL and HAF met in Greece in June 2010 to discuss further the terms of 47/10, but those discussions also led to two counterproposals as to the terms of the interim contract and the parties' respective obligations.  (*See* PTX 53, 54, 55).

Plaintiffs' counsel argued that Contract No. 47/10 became binding on the parties, despite the disagreements and counterproposals mentioned above, and there was a meeting of the

47

minds, apparently in January 2010, that the pricing terms of draft No. 47/10 would apply to freight-forwarding services from December 1, 2009 until the termination of EVL's services. These arguments are misplaced. Even if EVL agreed to the pricing terms in draft No. 47/10 during the discussion in January 2010, the negotiation participants did not have authority to execute a final, binding contract as explained by testimony from Plaintiffs' own witness, Captain Katirtzidis. The clear intent, at the very least on Plaintiffs' end, was that no binding agreement would be created until the Minister of Defense approved the draft version of 47/10 which the parties discussed in January 2010.[25] *See, e.g., Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd P'ship*, 734 F.Supp. 1181, 1188 (D.Md. 1990) ("[T]here is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract

---

[25] Captain Katirtzidis testified that even if the Minister of Defense declined to approve draft No. 47/10, the parties would still be bound by their commitments in the negotiated draft. (T. 04/16/15). Even assuming that were the case under Greek law, such is not the case in Maryland, where a meeting of the minds as to all essential terms is required to create a binding obligation. *See, e.g., Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. P'ship*, 734 F.Supp. 1181, 1188-89 (D.Md. 1990), *aff'd*, 937 F.2d 603 (4th Cir. 1991) ("In sum, plaintiff would have this Court conclude that the negotiating events themselves resulted in a binding contract. . . . Parties engage in negotiations not because they intend that the process itself will constitute the agreement, but because they desire and intend an eventual writing that will set forth the final terms satisfactory to both sides in every respect.").

document."); *TecArt Industries*, *Inc. v. National Graphics, Inc.*, 181 F.Supp.2d 451, 456 (D.Md. 2002) ("[T]he decision in a case like this one must be based on the particular facts before the Court.  Whether the parties negotiating a contract intended to be bound . . . must be determined from the facts and circumstances in each particular case.").

At most, participants in the January 2010 discussion had authority to *negotiate* the terms of an interim contract that would govern until the resolution of EVL's protest of the new contract award to Imperio-Argo Group.  George Georgakopoulos stated that the initials on the January 2010 draft of 47/10 are not his, but those of the attorney representing EVL at the time, and that the draft then was sent to EVL for review.  *See, e.g., Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996) ("The authority to negotiate [] is far different from the authority to agree to a specific settlement. . . . At most, Auvil's manifestations evince Snyder's [his attorney's] actual authority to conduct settlement negotiations."); *Schafer v. Barrier Island Station, Inc.*, 946 F.2d 1075, 1079 (4th Cir. 1991) ("[W]hen a client retains an attorney to represent the client in a transaction, the attorney has implied authority to negotiate the terms of an agreement or operative papers to their final form.  But custom of the relationship does not imply an authority for the attorney to execute the documents on behalf of

49

the client."). Because the parties never formalized their agreement to change the pricing terms – because it had yet to be approved finally by the Minister of Defense and EVL – there could not have been a meeting of the minds regarding the essential terms of draft No. 47/10 by anyone with authority to bind the parties. Consequently, EVL was free to change its mind regarding the pricing terms which may have been tentatively agreed to (but not made binding) during negotiations.

Moreover, if the parties entered into a binding contract based on the negotiated and initialed draft of 47/10 from January 2010, and the pricing rates included in that draft applied, there would have been no need for HAF to press EVL formally to sign the draft version in May and June 2010. *See, e.g., International Waste Indus. Corp. v. Cape Environmental Management, Inc.*, 988 F.Supp.2d 542, 552 (D.Md. 2013) ("Regardless of any signatures on that document, it is clear from IWI's own communications that further negotiations were necessary before a binding, comprehensive contract existed."); *Waterfall Farm Sys., Inc. v. Craig*, 914 F.Supp. 1213, 1221-24 (D.Md. 1995) (holding that signed Letter of Agreement was no more than a non-binding letter of intent because the parties intended that several additional documents would have to be agreed upon and executed before a binding and enforceable

contract existed and because there were extensive subsequent negotiations over undecided material terms).

During closing argument, Plaintiffs' counsel argued that EVL performed under draft No. 47/10 after its attorney initialed or signed the document in January 2010. The problem with this argument, however, is that it ignores that performance under No. 47/10 only differed in terms of payment of invoices, which concerns *Plaintiffs'* obligations, not EVL's. If EVL's conduct during this time period had been consistent with the terms of draft No. 47/10 – and not with Contract No. 100/09 – that could have served as evidence of the parties' intentions during this time period. EVL did not do *anything* consistent with draft 47/10 and inconsistent with Contract No. 100/09, however. Based on the foregoing, regardless of what the parties' representatives agreed to in January 2010, draft No. 47/10 never became a final binding contract.

Because draft No. 47/10 never became a final binding contract, the question remains as to what pricing terms apply to EVL's provision of freight forwarding services from December 1, 2009 until February 24, 2010. EVL's position is that if draft No. 47/10 never materialized into a final contract, then the terms of Contract No. 100/09 were extended until February 24, 2010 based on the parties' continued dealings during this time period. At the beginning of closing argument, Plaintiffs'

counsel was asked to articulate HAF's position as to what governed the parties' obligations during the time period from December 1, 2009 until February 24, 2010 if the court concludes that draft No. 47/10 was not a contract under applicable Maryland law. Somewhat circuitously, Plaintiffs' counsel stated that whether Contract No. 100/09 or "something else" applies turns on the nature of the parties' performance. Specifically, Plaintiffs' counsel indicated that if the acts following November 30, 2009 were that EVL receives and transfers goods and is paid for such services, the court could find that Contract No. 100/09 was extended by performance. Alternatively, he suggested that the court could find an implied contract of essential terms, whereby the court again could look to the terms of Contract No. 100/09. Finally, he suggested that a meeting of the minds occurred in January 2010 to change the nature of payment. For the reasons explained above, the different pricing terms according to zones and weight contained in the January 2010 version of draft No. 47/10 were discussed in the context of negotiations only, but were never *finally* agreed to by *both* parties.

"Whether parties negotiating a contract intended to be bound by a prior writing or whether they did not intend to be bound until a formal agreement was prepared and signed by them must be determined from the facts and circumstances in each

case." *Abt Associates, Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523, 531 (D.Md. 2000) (*citing Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493 (1948)); *Tecart Industries, Inc. v. National Graphics, Inc.*, 198 F.Supp.2d 719, 724 (D.Md. 2002) (same).  Mr. Georgakopoulos testified that EVL continued to provide freight forwarding services from December 1, 2009 until its services were terminated just as it had done under Contract No. 100/09.  (T. 04/21/15).  It is uncontested that before the negotiation took place in January 2010 regarding draft No. 47/10, the parties continued to operate under their normal course.  It is also undisputed that no agreement was entered into to supplant or change the terms of Contract No. 100/09 for the month of December, at the very least.

Captain Katirtzidis stated that from December 2009 until February 12, 2010, the Hellenic Armed Forces continued to utilize EVL's services to forward goods to Greece.  (T. 04/16/15).  Although the logistics directorate of the General Staff issued a directive to reduce transportation of materials from the United States and Greece and to use alternative means, such as C130 aircraft, the freight forwarding needs of the Armed Forces still needed to be satisfied by continuing to use EVL's services.  (*Id.*).  The invoices for EVL's services from December 1, 2009 until February 24, 2010 were issued between May and July 2010, months after the provision of services.  EVL continued to

perform freight-forwarding services after the expiration of November 30, 2009 and undoubtedly, HAF understood that EVL would be compensated for its services.  Aside from the pricing terms of draft No. 47/10, which do not apply for the reasons stated, Plaintiffs have not offered any alternative pricing scheme for evaluating the value of Defendant's services during this time period.  Captain Nikomanis testified that the fifty-one invoices were properly supported if the pricing terms of Contract No. 100/09 were to apply.  (T. 04/20/15).  By continuing to perform their obligations under Contract No. 100/09 despite the absence of a binding agreement from December 1, 2009 until February 24, 2010, the parties continued to operate under the terms of Contract No. 100/09.  *See, e.g., Schalk v. Associated Anesthesiology Practice*, 316 F.Supp.2d 244, 246 n.2 (D.Md. 2004) ("Schalk's 1998 contract with AAP expired on December 31, 1999. AAP provided Schalk with a new agreement to be effective January 1, 2000, but he refused to sign it.  Thus, after the expiration of the 1998 contract, the parties continued to operate under the same terms and conditions of that contract.").

Accordingly, HAF will be ordered to pay $208,464.24 for the fifty-one invoices, which is the amount due under Contract No. 100/09.  (*See* DTX 10).

## 2.   Invoices 52-64

Plaintiffs state that they did not pay invoices 52 through 64 relating to transportation of materials by C-130 aircraft to Greece because they were "not billed on the basis of contractual agreements." (PTX 81, HAF 001367).  Captain Nikomanis testified that under Contract No. 100/09, EVL was required to provide third-party documentation justifying the charges.  Yet EVL only provided its own documentation, which contained large charges without third-party documentation.  (T. 04/17/15).  Captain Nikomanis stated that EVL provided hand-written supporting documentation from itself (rather than third-parties), as reflected in Plaintiffs' Exhibit 44.  (*See* PTX 44).  Captain Nikomanis explained that in order to be reimbursed under Contract No. 100/09, however, EVL should have provided invoices or receipts of expenses from third parties.  (T. 04/17/15).  Ms. Siu stated that invoices 52 through 64 involved inland transports to Dover, Delaware by EVL for overseas transport by C-130 aircraft.  (T. 04/23/15).  She stated that EVL provided the inland freight itself, but she did not know why.  (*Id.*).

Article 4.3 of Contract No. 100/09 states:

> The GS (General Staff) of the HAF reserves the right, when it deems appropriate, to use other means of transportation that belongs to HAF or are secured by it (the HAF) for the air transportation.  When other means of the HAF are used, i.e., C-130 A/C etc., *the*

> *transporter is obliged to provide for the
> loading/unloading of the materials (at the
> Air Force A/P) within the U.S.A. and to
> conduct the relevant customs clearance
> procedures, issuance of import-export
> permits, forwarding of the materials to the
> final recipients within the U.S.A.,
> regardless of the airport (civil or
> military) where the said A/C will land.*

(DTX 1) (emphasis added).   Article 8 of Contract No. 100/09 covers payment terms.   Article 8.4.2 of Contract No. 100/09 states: "Original bills of lading and other original invoices (e.g., customs charges) for A/L expenses paid by the contractor and intermediary carriers (INLAND FREIGHTS) (or official copies) duly repaid and audited for price accuracy by the contractor." (DTX 1).   Article 8.4.4 states: "[o]riginal expense invoices (e.g., customs charges) and original transatlantic freight bills of lading for A/L expenses paid by the contractor (or official copies) duly repaid and audited for price accuracy by the contractor." (*Id.*).

Based on these terms in Contract No. 100/09, HAF did not breach the contract by refusing to pay invoices 52-64. Defendant did not include supporting documentation justifying the considerable charges for customs clearance, import documentation preparation, or inland transportation.   (PTX 44). Nothing in the contract authorized EVL to perform the work (and then charge HAF for the expenses) as opposed to utilizing the services of a third-party and receiving reimbursement from HAF

as contemplated by Contract No. 100/09.   Because EVL failed to provide supporting third-party documentation justifying these invoices, HAF will not be ordered to reimburse EVL for the expenses.

### 3.  Invoices 65-67

Defendant seeks reimbursement of $231,041.91 for invoices sixty-five through sixty-seven concerning shipments from Greece to the United States using GoldAir.  (DTX 12; T. Siu 04/23/15). HAF did not pay these three invoices because they were not supported by original documents but by photocopies.  (PTX 81, HAF 001367; T. Nikomanis 04/17/15).   Captain Nikomanis stated that according to Contract No. 100/09, Greek authorities could not make payment if the bill of lading or invoice was not original, but a copy.  He explained that only originals – not copies – were acceptable due to risk of forgery or double payments.

HAF did not breach Contract No. 100/09 by refusing to pay these invoices.   EVL sent a letter to the Air Force in the summer of 2010, stating in relevant part:

> It is impossible to provide the Air Force with copy 2 of the issued bills of lading issued corresponding to the invoices since, as mentioned on said invoice "FOR CONSIGNEE" this copy is in the hands of the ultimate consignee in the U.S.A., which is sometimes the Greek Embassy in Washington and other times the corresponding repair house.

(PTX 49).   Ms. Siu testified that EVL paid GoldAir by wire transfer.   (T. 04/23/15).   Defendant provided the AirWay bill received from GoldAir, but it is illegible.   (DTX 12, EVL 03565).   At trial, EVL also submitted additional documentation purporting to show payment from EVL to GoldAir.   As stated above, Article 8.4.2 of Contract No. 100/09 required original bills of lading and original invoices.   Captain Nikomanis testified that eventually HAF was prepared to pay these invoices *despite* the fact that only photocopies were provided, on the condition that the airline sign the copies to confirm authenticity and EVL submit a declaration that if the originals were found, it would not resubmit the charges.   (T. 04/17/15). Captain Nikomanis stated that EVL never responded to this request.   Contract No. 100/09 required that charges be supported by original invoices and bills of lading.   Thus, because of EVL's refusal to submit verification from the airline and a declaration not to resubmit these invoices if originals were found, HAF will not be ordered to pay these invoices.

### 4.   Invoices 68-78

EVL seeks payment of invoices 68-78 in the amount of $241,778.05.   (DTX 13).   HAF asserts that these eleven (11) invoices were not paid because they contained "unconventional additional charges." (PTX 81).   Although some of the charges in these invoices were deemed appropriate by the Hellenic Air

58

Force, *none* of the expenses contained in these eleven invoices were paid to EVL for two principal reasons: (1) Plaintiffs believed that some of these invoices included charges for hazardous materials but after the Air Force conducted an audit it was determined that the materials were not actually hazardous (*see* DTX 13 & PTX 13 & 15); and (2) all of the invoices included charges for expedited and/or oversized shipments, which were approved by the Air Attache but that Plaintiffs now state were not authorized (DTX 13).  (T. Nikomanis 04/17/15 & 04/20/15).

Captain Nikomanis testified that he applied Article 7.2.2 of Contract No. 100/09 to determine whether material was hazardous, and thus whether to pay the charges for hazardous materials.  (T. 04/17/15).  He stated that he asked the General Staff about whether the invoices showing charges for hazardous materials, (PTX 13 & 15),[26] could be paid and they agreed that these charges could not be reimbursed.  He also explained that the General Staff ordered an investigation into whether such payment had been made in the past.  Mr. Klothakis – the liaison officer in EVL's facility – reviewed the invoices and prepared several reports, and George Katsanis completed the investigation after Captain Klothakis left the division.  (PTX 67, 68, 72, & 77 & T. Nikomanis 04/17/15).  Based on the investigation, HAF

---

[26] During his testimony, Captain Nikomanis identified Plaintiffs' Exhibits 13 and 15 as representing invoices that included allegedly improper charges for hazardous materials.

determined that some of the invoices should be rejected entirely and that HAF previously *overpaid* on invoices that also included allegedly improper charges for hazardous materials.  (DTX 15). Ngai Siu, the accounting manager with EVL, testified that the invoices that Plaintiffs believe involved hazmat shipping charges (PTX 13 & 15) actually were not shipped hazmat, but instead included special handling charges.  She stated that EVL uses the same pre-printed template forms for its invoices which automatically listed a hazmat number even where EVL did not charge for hazmat materials.  A review of the invoices reflects that some of the invoices (invoices 69, 70, 71, & 73 (DTX 13)) included charges under "payment for haz-mat items."

Plaintiffs improperly refused to pay invoices due to charges for hazmat materials.  Article 7.2.2 of Contract No. 100/09 states: "Loads with contents *such as* ammunition, explosives or flammable chemicals, are excluded from the method of costing the transportation of materials.  Prices will be adjusted as the case may be, *with the consent of the Military Attaches*."  (DTX 1) (emphases added).  The Air Attaches approved all of the charges for these eleven (11) invoices.  Captain Nikomanis testified during his cross-examination that the Air Attache did not have authority to authorize the charges because the materials were not hazardous.  Although Mr. Klothakis (and later Mr. Katsanis) conducted an audit and determined that some

of the items were not actually hazardous, the charges were approved at the time by the Air Attache, who pursuant to Article 7.2.2 is *authorized* to adjust prices for certain materials. Plaintiffs' assertion that hazardous material is limited to "ammunition, explosives or flammable chemicals" is also unavailing because of the use of the words "such as" in Article 7.2.2, suggesting that other contents may be regarded as warranting a price adjustment with the consent of the Military Attaches. The post-hoc determination that hazmat charges covered items that were not actually hazardous is an end run around Article 7.2.2, which vests authority within the Military Attaches to adjust prices for shipment of certain materials. Plaintiffs' request for a setoff for previously paid invoices that "improperly" included hazmat charges will be denied for the same reasons.

Plaintiffs' only other objection to these eleven (11) invoices concerns charges for expedited and oversized materials. These invoices are supported by an "oversize/expedited shipment approval worksheet," which contain charges for expedited handling and/or oversized shipment *approved* by the Air Attache. (DTX 13). Plaintiffs take the position that despite the fact that EVL was requested to expedite shipments of certain materials or that some shipments included oversized items, *and* the fact that the Air Attache representing the Greek government

in the United States *approved* the additional charges, EVL cannot be reimbursed because the Air Attache actually had no authority to approve any charges other than for hazmat materials as set forth in Article 7.2.2 of Contract No. 100/09.   Plaintiffs contend that discretion to authorize additional fees in Article 7.2.2 is limited to hazardous materials and does not encompass any additional charges such as for expedited or oversized shipments.

During closing argument, Plaintiffs' counsel asserted that contracts involving sovereign nations cannot be modified by conduct and actual authority is required to modify the terms of an existing contract.   Plaintiffs' counsel argued that the Air Attache did not have actual authority to change the terms of the contract, consequently the actions of the Air Attache cannot bind the Greek government.   The analysis in *Velaco v. Government of Indonesia*, 370 F.3d 392, 399-400 (4th Cir. 2004), provides guidance on this point:

> [C]ourts have imposed an affirmative obligation upon a person transacting business with an agent of the United States to determine whether the agent is vested with authority to bind the Government.   *See, e.g., The Floyd Acceptances*, 74 U.S. [666] at 676 [1868] (purchaser of commercial paper issued by a government official which purports to bind the government has an affirmative obligation to determine whether the agent has express authority to bind the government); *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383-84 (1947)

("[A]nyone entering into an arrangement with
the Government takes the risk of having
accurately ascertained that he who purports
to act for the Government stays within the
bounds of his authority."); *Atlantic Tobacco
Co. v. United States*, 249 F.Supp. 661, 663
(D.S.C. 1966) ("In dealing with the
government, unlike those with private
parties, one is charged with knowledge of
the extent of the actual authority of the
government's contracting agent since no
agent . . . can hold out to have any
authority not sanctioned by law.").  It is
insufficient that the person dealing with
the agent believes the agent has authority.
*United States v. Vanhorn*, 20 F.3d 104, 112
n.19 (4th Cir. 1994) (oral representations by
government officer cannot modify statutory
contract); *Doe v. Civiletti*, 635 F.2d 88, 96
(2[d] Cir. 1980) ("In spite of its rigor, the
actual authority doctrine has been
scrupulously followed.").

. . .

Whether a third party reasonably perceived
that the sovereign has empowered its agent
to engage in a transaction, however, is
irrelevant if the sovereign's constitution
or laws proscribe or do not authorize the
agent's conduct and the third party fails to
make a proper inquiry.  We conclude that a
foreign official's manifestation of
authority to bind the sovereign is
insufficient to bind the sovereign.

In light of the above authority, we concur
with the position of the Ninth Circuit and
hold that the commercial activity exception
may be invoked against a foreign state only
when its officials have actual authority.

The court need not determine whether the Air Attache had

actual authority to modify the contract, however, because

Contract No. 100/09 was not modified.  Captain Katirtzidis

testified that for a contract to be binding, it had to be approved by the Minister of Defense. (T. 04/16/15). Nothing in Contract No. 100/09 provides, and Plaintiffs have presented no other evidence to prove, that only the Minister of Defense can authorize additional charges for expedited shipments that the Greek government *itself* requests. EVL did not ship the items expedited based on its own volition. George Georgakopoulos testified that EVL frequently received requests from the Armed Forces regarding expedited and oversized shipments. (T. 04/21/15). He stated that such shipments were always preauthorized by the attache liaison, Mr. Klothakis, and all of the paperwork was taken and authorized by the Greek embassy. (*Id.*). Mr. Klothakis's report, dated October 12, 2010, concerning "[d]etailed findings of the audit of EVL invoices," refers to specific invoices which either concerned oversized materials or required expedited shipment:

> e. Invoice EVL13263/11-12-09, concerns the urgent transfer of materials. With the air transportation bill AWB#050-5283-9542, *critical material O/N 08E221, NSN 1680200042570, WATER DROP CONTROL UNIT, EA-1 were transferred*./ As Addendum "5," 12 pages of documents – records are listed regarding invoice EVL13263/11-12-2009 and the expedited transportation of said literature.
>
> f. *Invoice EVL13323/31-12-09, concerns the urgent transfer of 26 materials by air transportation bill AWB#050-5283-9732. The material Blade Assy of the 075637 was*

> *crucial and the entire cargo was transferred*
> *expedited.* As Addendum "6," 11 pages of
> documents – records are listed regarding
> invoice EVL13323/31-12-2009 as well as the
> expedited transportation. . . .
>
> g. Invoice EVL 13357/31-12-2009, concerns
> the transportation of 2 materials by air
> transportation bill AWB#050-5283-9883. *The*
> *material O/N 075979 Cylinder Assy was*
> *crucial and the transportation was*
> *expedited. . . .*

(PTX 67, HAF 002214-002220) (emphases added). Where crucial

material needed to be transported on an expedited basis, the

invoices were preapproved by the Air Attache.

Moreover, Article 22 of Contract No. 100/09 which covers

amendments, states, in relevant part:

> 22.1.   This Contract may be amended or
> corrected only by mutual written agreement
> between the CONTRACTOR and the HAF or on
> their behalf by their legally authorized
> representatives.
>
> 22.2.   Any amendment will be an integral
> part of this Contract and will be
> implemented by replacing the relevant pages.
>
> . . .
>
> 22.4.   If the amendment is agreed, *then the*
> *provisions under amendment will be*
> *suspended, while the other provisions will*
> *remain in effect.*

(DTX 1) (emphasis added). Articles 22.2 and 22.4 suggest that

an amendment requires the replacement of an existing provision

with a new term. As explained, the conduct of the Air Attache

in approving charges for oversized or expedited shipments does

not modify or change any provision of Contract No. 100/09,
however.   The testimony at trial confirms that EVL received
requests occasionally to ship oversized and/or urgent or
critical material; these were ad hoc requests and the approval
of additional charges associated with such requests did not
constitute a modification of the contract, which only someone
with authority to act on behalf of the Greek government can
authorize.

Approval by the Air Attache of expedited shipments and
oversized materials is not inconsistent with the terms of
Contract No. 100/09.  The following provisions are instructive:

> 4.5.1.6. The CONTRACTOR shall not issue more
> than one (1) bill of lading per day for each
> GS (General Staff) in Greece, in the case of
> FMS materials and more than one bill of
> lading every two days for Commercial Firm
> materials, *except for urgent transportation*
> *of material and provided that it is not*
> *possible to include both these categories of*
> *materials in one bill of lading. A material*
> *is considered "urgent" if the CONTRACTOR has*
> *been notified as such by the competent*
> *branch of the HAF.*
>
> 4.5.2.12.   . . . "Urgent" material is the
> material for which the CONTRACTOR shall be
> informed by the competent branch of the HAF.
>
> 4.5.2.15.  Alerts by electronic mail (e-mail
> or fax) the competent services of the HAF
> (DKN Service – 201 Air Force Supply Depot –
> Air Force Support Command/C4 for the Air
> Force, Navy Supply Depot for the Navy and
> 651 War Material Brigade for the Army),
> within two (2) days after the date of the
> bill of lading and in regards to urgent

> materials, within one (1) day for the exact
> date of arrival of the materials at the A/P
> in Greece (El. Venizelos), *with concurrent*
> *notification of the corresponding attache.*

(DTX 1) (emphases added).  These provisions reflect that EVL was to be notified by the "competent branch of the HAF" whether material is urgent.   "Competent branch of the HAF" is not defined in Contract No. 100/09.  Nothing in these provisions or others within Contract No. 100/09 suggest that only the Minister of Defense can authorize extra charges for shipments that the Greek government itself requested be shipped on an expedited basis because they contained material deemed critical.

Plaintiffs' counsel also argued during closing argument that Military Attaches can consent to price adjustments only as to ammunition, explosives or flammable chemicals listed in Article 7.2.2.   This reading of Article 7.2.2 is too narrow. The fact that Article 7.2.2 authorizes Military Attaches to adjust prices regarding transportation of hazardous materials does not suggest that those are the *only* costs that Military Attaches have authority to approve.   If that were the case, it would be stated explicitly in the contract.  Plaintiffs have not cited, nor does there appear to be any, contractual provision

explicitly stating that the *only* additional charges that the Air Attache may authorize concern hazardous materials.[27]

Accordingly, Plaintiffs will be ordered to pay $241,778.05 to EVL as reimbursement for invoices sixty-eight (68) through seventy-eight (78).

### 5. Pre-Judgment Interest

EVL also seeks pre-judgment interest on the outstanding invoices from January 2011.   During trial, Defendant presented no evidence regarding pre-judgment interest and defense counsel requested that EVL be awarded pre-judgment interest for the first time during closing argument.   Notably, nowhere in the damages section in the amended pretrial order or anywhere else in the order did EVL request pre-judgment interest.   (*See* ECF No. 49-2, at 18).   Without relying on any specific provision in the contract, defense counsel broadly argued during closing argument that Contract No. 100/09 provides for the legal rate of interest, and that the disputed invoices were all received in 2010 and have long remained outstanding.

---

[27] It is worth noting that Plaintiffs take inconsistent positions concerning different aspects of this case.   On the one hand, they contend that only the Minister of Defense can bind Greece to the terms of a contract or authorize anything they perceive as outside the scope of a contract.   Yet they argue that the court should accept that the initials on draft No. 47/10 by representatives of both parties during negotiations in January 2010 obligated the parties to the terms of that document.

Article 16.8 of Contract No. 100/09 states: "In the case of any delay in the repayment of the CONTRACTOR's entitlements, the CONTRACTOR shall send a reminder letter.   In the case that the said delay continues or repeats, overdue interest will be paid to the CONTRACTOR as provided by the Greek laws." (DTX 1).   EVL cited the contract as authority for granting pre-judgment interest on the outstanding invoices but under the contract, Greek law applies to payment of interest.   Defendant has offered no evidence regarding Greek law as to interest.   Moreover, under Maryland law, "interest is allowable as a matter of right for a breach of contract to pay when the amount due has been liquidated, ascertained, or agreed to." *United States v. State of W.Va.*, 764 F.2d 1028, 1031 (4th Cir. 1985); *Wood Prods., Inc. v. CMI Corp.*, 651 F.Supp. 641, 653 (D.Md. 1986).   Here, the amounts due were disputed and not ascertained until now. Accordingly, no pre-judgment interest will be ordered.

### III. Conclusion

For the foregoing reasons judgment will be entered in favor of Plaintiffs on the conversion and detinue counts in the second amended complaint.   EVL will be ordered to release the remaining materials and compensate Plaintiffs in the amount of $75,341.09.

Judgment will be entered in favor of EVL on its breach of contract counterclaim and Plaintiffs will be ordered to pay the

invoices in accordance with the foregoing memorandum opinion in the amount of $450,242.29.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
